85 P.3d 497

**STATE of Arizona, Appellee,**

v.

**Elizabeth Delariva VOGEL, Appellant.**

**No. 1 CA–CR 02–0222.**

Court of Appeals of Arizona,
Division 1, Department E.

March 4, 2004.

Terry Goddard, Attorney General By Randall M. Howe, Chief Counsel, Criminal Appeals Section and Joseph T. Maziarz, Assistant Attorney General, Phoenix, Attorneys for Appellee.

James J. Haas, Maricopa County Public Defender By Spencer D. Heffel, Deputy Public Defender, Phoenix, Attorneys for Appellant.

## OPINION

HALL, Judge.

¶ 1 Elizabeth DeLariva Vogel (defendant) was convicted of manslaughter in the death of her husband. On appeal, she argues that the trial court erred when it instructed the jury that the use of physical force against another is not justified in response to verbal provocation alone in a case involving a defendant against whom the victim has committed domestic violence.[1] We have jurisdiction pursuant to Arizona Revised Statutes (A.R.S.) sections 12–120.21(A)(1), 13–4031, – 4033(A)(1) (2003). We conclude that the trial court correctly instructed the jury, pursuant to Arizona's statutory scheme, that verbal provocation alone is insufficient to justify the use of physical force in self-defense; instead, a fact finder must consider any history of domestic violence in determining whether a defendant reasonably believed the victim's statements were a threat amounting to more than mere verbal provocation.

## FACTS AND PROCEDURAL HISTORY

¶ 2 On February 26, 2001, defendant called her daughter-in-law, Maria Garcia (Maria). Defendant was crying and screaming and said she had killed her husband, Charlie Vogel (victim). In response, Maria called 911. The Peoria police responded to the call and went to defendant's residence. When they arrived, defendant told an officer, "I killed my husband." The police found the victim on the floor in the kitchen. The victim was later pronounced dead at the scene, with the cause of death determined to be a gunshot wound to the chest entering from the victim's left side.

¶ 3 Defendant was indicted for second degree murder. At trial, she claimed she was a battered woman and acted in self-defense. Because defendant claimed that she was abused, we review her history in some detail.

¶ 4 Defendant was born in El Paso, Texas to Mexican parents. She married at age eighteen or nineteen, had two children, but divorced her first husband because he was abusive. She later had two more children.

¶ 5 In 1976, defendant and her children moved to Phoenix to live with her mother and sister. The victim, a next-door-neighbor, dated defendant for four years before they married in 1982 and began living together in victim's house.

¶ 6 Defendant testified that she knew the victim drank before they were married, but did not know he was an alcoholic until after their marriage. She also testified that the victim was a "good guy" when he was sober and she loved him. However, when the victim drank, he became angry, yelled and swore at defendant and her sons, and used racial slurs against them.

¶ 7 Defendant testified that, over the years, the victim's drinking problem worsened and a pattern of violence and physical abuse emerged. She testified that he sometimes hit her or grabbed her by the hair, put his fists through the walls and damaged furniture, and kicked defendant's legs when she tried to run outside or hit her in the face and knocked her down.

¶ 8 Defendant also testified that the victim broke her wrist by causing her to fall from a chair and threw a knife at her when she asked him to fix her car. The victim kept a number of guns and ammunition in the house. Defendant testified that he also had a .357 handgun in a fanny pack that he kept in his possession at all times. Furthermore, defendant testified that, on more than one occasion, the victim threatened to kill himself and defendant, saying, "You know that when I commit suicide, I'm going to take you with me." In an attempt to hide from the victim, defendant stated that she often slept in a trailer that was located on the victim's property.

¶ 9 Defendant's daughter-in-law, Maria, testified that defendant would stay with her and Manuel Garcia, defendant's adult son, every two or three months. Maria added that defendant would often cry and was usually frightened and nervous.

---

1. Defendant raises two issues on appeal. We address the remaining issue in a separate Memo-randum Decision. *See* Ariz. R.Crim. P. 31.26.

¶ 10 During an incident in September 1999, the victim was drinking excessively and was depressed. While seated at the kitchen table with his gun in front of him, the victim began to blame defendant for his problems. He called her a "bitch" and other derogatory names and said, "I'm sick and tired of the whole thing. I'm going to get rid of you." Believing the victim would kill her, defendant turned around, got down on her knees and started to pray. She heard a shot. When she got up, she saw a bullet hole in the ceiling and the victim with blood on his face. The victim was admitted to a psychiatric hospital. However, defendant testified that after he returned, his drinking increased and he became more violent.

¶ 11 On the day the victim died, February 26, 2001, defendant testified that the victim started drinking at 4 a.m. Later in the day, while the victim took a nap, defendant went to a store, purchased a twelve-pack of beer. Defendant claimed she drank three beers; however, there were only six remaining when the police later searched the home. After the victim awoke, he sat at the kitchen table, with his fanny pack containing a gun placed in front of him. As in the past, the victim's voice became deeper and his hands were shaking. The victim began to call defendant, those "horrible names," like "stupid," "idiot," "bitch," and "whore" and said, "I'm getting rid of you. I need another woman." He told her, "I want your ass out of here."

¶ 12 At trial, defendant testified that these events brought back memories of the September 1999 incident in which the victim sat at the kitchen table with a gun in front of him; his voice deepened, his hands shook, he was angry and verbally abusive. She testified that when she took the gun from the dining room, pointed it at him and then shot him, she was afraid for her life. She denied that the victim told her that he intended to divorce her, but admitted he said he wanted to get rid of her.

¶ 13 Defendant's family members also testified that the victim was an alcoholic and abused defendant both emotionally and physically. Other witnesses testified that defendant was a peaceful person.

¶ 14 Dr. Michael Bayless, a forensic psychologist, testified for defendant as an expert on domestic violence. Explaining the dynamics of economic and psychological control that the abuser has over the victim, he described a cycle of intimidation, threats, and violence by the abuser. He related that physical abuse is often intermittent and that there are subtle signs in the form of gestures or actions that precede physical violence. Becoming conditioned to such signs or "triggers," the victim can sense when physical violence may occur. He further explained the pattern of domestic violence in which abusers blame others for their problems and create feelings of guilt, shame, self-blame, fear, depression and anxiety in their victims.

¶ 15 Dr. Bayless indicated that he had examined defendant and had diagnosed her with major depression, low self-esteem, post-traumatic stress syndrome and dependent personality. Based upon his review of the police reports, his interviews with defendant and other family members, and his evaluation of various psychological tests, he concluded that defendant was the victim of domestic violence.

¶ 16 Dr. Bayless also opined that on the day of the shooting, defendant was fearful for her life. This was based upon her long history of victimization and the victim's pattern of drinking to excess, becoming angry, verbally abusive and sometimes physically violent. He also stated that on February 26, 2001, defendant had a flashback of the September 1999 incident in which the victim threatened to kill her and attempted suicide. The flashback, together with her isolation and the victim's statement that he was going "to get rid of her," led her to reasonably believe that she was in imminent danger for her life. At trial, defense counsel claimed that based upon past acts of domestic violence, defendant reasonably believed that deadly physical force was necessary to protect herself against the victim's threatened use of deadly physical force and that her actions were justified.

¶ 17 In contrast, the State offered an alternative version of defendant's motive for shooting the victim based on a tape-recorded statement she provided to police the day of

the shooting. In that interview, defendant explained that she did not want to hear any more hurtful remarks and proceeded to the dining room where she retrieved a loaded gun from the china cabinet. Defendant stated,

> [The victim's words] were hurting me. What he was saying to me, I just wanted the gun.... I said to myself [sic] just didn't want to hear that anymore.... I went and I got the gun and I had it in my hand, and it was just, it was just so easy.... I was so frustrated.

Although she had never used a gun before, defendant said she went into the kitchen, pointed the gun at the victim, and pulled the trigger. She admitted to police that she "surprised" the victim and conceded that he did not present a threat to her at the time of the shooting.

## DISCUSSION

¶ 18 During the settlement of the jury instructions, the parties discussed the self-defense instructions. The State offered instructions that essentially tracked the language of A.R.S. sections 13–404(A)(B) and – 405 (2001). Section 13–404 provides in pertinent part that:

> A. Except as provided in subsection B of this section, a person is justified in using physical force against another when and to the extent a reasonable person would believe that physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful physical force.
>
> B. The threat or use of physical force against another is not justified:
>
> 1. *In response to verbal provocation alone*....

(Emphasis supplied.) Section 13–405 provides that:

> A person is justified in threatening or using deadly physical force against another:
>
> 1. If such person would be justified in threatening or using physical force against the other under 13–404, and
>
> 2. When and to the degree a reasonable person would believe that deadly physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly physical force.

Defendant requested and received an instruction under § 13–415, which provides that:

> If there have been past acts of domestic violence as defined in § 13–3601, subsection A against the defendant by the victim, the state of mind of a reasonable person under §§ 13–404, 13–405 and 13–406 shall be determined from the perspective of a reasonable person who has been a victim of those past acts of domestic violence.

¶ 19 Defense counsel objected to the inclusion of the language of § 13–404(B)(1), claiming that § 13–415 essentially "trumped" the provision that verbal provocation alone does not justify the use of physical force. He argued that, considering the victim's state of mind and the nature of the past acts, verbal provocation alone might justify the use of deadly physical force.

¶ 20 The State argued that § 13–415 did not negate the effect of § 13–404(B)(1), but simply required the jury to consider self-defense in light of the state of mind of a victim of domestic violence. It claimed that all the provisions were consistent with one another, that notwithstanding the language in § 13–415, § 13–404(B)(1) was a correct statement of the law and that the jurors needed to be instructed on all the applicable law.

¶ 21 The judge initially decided to omit the language of § 13–404(B)(1) in the jury instructions. She stated that, "[i]t just seems to me that 415 has to trump those bright-line tests, and I'm going to confuse the Jury if I tell them [sic] here's a bright-line test, with no exceptions." The court stated that the standard self-defense instructions would be sufficient without the language of § 13–404(B)(1).

¶ 22 However, prior to closing argument, the judge changed her mind and decided to include the language of § 13–404(B)(1) in the final jury instructions. She concluded that § 13–415 did not "trump" §§ 13–404 and 405 and that § 13–404(B)(1) was the law. Defense counsel objected on the ground that the

instruction was confusing, highly prejudicial, and that it denied defendant her due process rights because it basically told the jury "they can't consider self-defense if there were only words...."

¶ 23 Alternatively, defense counsel suggested that the court add the following language to the verbal provocation instruction: "except as is warranted where you find there have been past acts of domestic violence, verbal provocation alone does not justify the use of physical force." The court rejected this modification. Defense counsel also requested that the court preclude the prosecutor from arguing to the jury that words alone are not sufficient provocation. The court demurred, refusing to limit the prosecutor's closing argument in this respect. The jury was instructed in accordance with this ruling.[2]

¶ 24 On appeal, defendant argues that the instruction on verbal provocation rendered the instruction based on § 13–415 "meaningless" by "prevent[ing] the jury from considering the events of February 21, 2001 in light of the couple's domestic violence history." The State argues that the applicable statutes should be construed as complementary rather than contradictory in order to fulfill the intent of the legislature.

¶ 25 We review de novo the statutory construction that provided the basis for the trial court's jury instruction. *See State v. Wolter,* 197 Ariz. 190, 192–93, ¶¶ 7–12, 3 P.3d 1110, 1112–13 (App.2000). "The primary rule of statutory interpretation is to determine and give effect to the legislative intent behind the statute." *State v. Korzep,* 165 Ariz. 490, 493, 799 P.2d 831, 834 (1990). We give the words of a statute their usual and commonly understood meaning "unless the legislature has offered its own definition of the words or it appears from the context that a special meaning was intended." *Mid Kansas Fed. Sav. & Loan v. Dynamic Dev. Corp.,* 167 Ariz. 122, 128, 804 P.2d 1310, 1316 (1991). Further, if possible, we must "give meaning to each clause and consider the effects and consequences as well as the spirit and purpose of the law." *State v. Garza Rodriquez,* 164 Ariz. 107, 112, 791 P.2d 633, 638 (1990). Likewise, we avoid interpreting a statute in a manner that would render any portion of it

2. The self-defense instruction read:
A defendant is justified in using or threatening physical force in self-defense if the following two conditions existed:
No. 1. A reasonable person in the defendant's situation would have believed that physical force was immediately necessary to protect against another's use or attempted use of unlawful physical force; and
No. 2. The defendant used or threatened no more physical force than would have appeared necessary to a reasonable person in the defendant's situation. The threat or use of physical force against another is not justified in response to verbal provocation alone.
A person is justified in threatening or using deadly physical force against another:
No. 1. If such person would be justified in threatening or using physical force against the other as described above and
No. 2. When and to the degree a reasonable person would believe that deadly physical force is immediately necessary to protect herself against the other's use or attempted use of unlawful deadly physical force.
"Deadly physical force" means either:
No. 1. Force which is used with the purpose of causing death or serious physical injury, or
No. 2. Force which in the manner of its use is capable of creating a substantial risk of causing death or serious physical injury.

Self-defense justifies the use or threat of physical force only that [sic] while the apparent danger continues. The right to use physical force in self-defense ends when the apparent danger ends. The standard for determining whether a defendant is entitled to the defense of self-defense is whether a reasonable person, similarly situated, would believe that physical force was immediately necessary to protect against another's use or attempted use of unlawful physical force. That the defendant's belief was honest is immaterial. You must measure the defendant's belief against what a reasonable person would believe.
If you find that there have been past acts of domestic violence, as defined below, against the defendant by the victim, the state of mind of a reasonable person, for purposes of the above instruction on self-defense/justification, shall be determined from the perspective of a reasonable person who has been a victim of those past acts of domestic violence.
....
If you find that the defendant has proved self-defense, justification by a preponderance of the evidence, then you must find the defendant not guilty of the crime charged.

meaningless. *State v. Casey,* 205 Ariz. 359, 366, ¶ 27, 71 P.3d 351, 358 (2003).

¶ 26 Sections 13–404 and –405, enacted as part of the comprehensive revision of the Arizona Criminal Code in 1978, *see* 1978 Ariz. Sess. Laws, ch. 201, prohibit the use of physical force in self-defense in response to mere verbal provocation. According to defendant, however, § 13–415, added by 1992 Ariz. Sess. Laws, ch. 124, § 1, effectively creates an exception to the mere provocation rule in situations where the defendant has been subjected to past acts of domestic violence. Citing the testimony of Dr. Bayless, defendant contends that the victim's behavior coupled with his comments caused her to "flashback" to the events of September 1999 and perceive her life to be in danger.

¶ 27 The premise of defendant's argument is that § 13–415 and § 13–404(B)(1) are irreconcilable. However, a brief examination of the interrelationship between these two provisions as incorporated within § 13–404(A) shows otherwise. Read together, §§ 13–404(A) and –415 require that the reasonableness of a defendant's *belief* regarding the necessity of using physical force in self-defense be considered from the perspective of a reasonable person who has suffered the same past acts of domestic violence. However, the beginning sequence of § 13–404(A) ("Except as provided in subsection B of this section") makes it clear that under no circumstances—regardless of the reasonableness of a defendant's belief—is the use of physical force a justified response to "verbal

provocation alone." [3] Therefore, as a matter of sentence structure, §§ 13–404(B)(1) and – 415 are grammatically consistent. There being no apparent ambiguity in the statutory scheme, our inquiry would normally end here. *See State v. Thompson,* 200 Ariz. 439, 440, ¶ 6, 27 P.3d 796, 797 (2001) ("When the language of a statute is clear, it is determinative of the statute's construction.").

¶ 28 Defendant contends, however, that a plain meaning interpretation of the statutory scheme renders § 13–415 meaningless. *See State v. Estrada,* 201 Ariz. 247, 251, ¶ 19, 34 P.3d, 356, 360 (2001) ("[W]e will not employ a 'plain meaning interpretation [that] would lead to ... a result at odds with the legislature's intent.' ") (quoting *Resolution Trust Corp. v. Western Techs., Inc.,* 179 Ariz. 195, 201, 877 P.2d 294, 300 (App.1994)). We disagree. Indeed, the circumstances of this case provide an apt example of the harmonious relationship between §§ 13–404(B)(1) and –415. If the jury agreed with the prosecutor that defendant could not have reasonably believed the comments made by the victim on February 21st to be a credible threat of imminent physical harm but were instead mere verbal abuse, then the instruction based on § 13–404(B)(1) would have precluded the jury's consideration of defendant's justification claim. But, as the trial court instructed, the jury was required by § 13–415 to consider any past acts of domestic violence committed by the victim in determining the reasonableness of defendant's belief.[4] Following this instruction, the jury could have decided that defendant reasonably

3. The phrase "verbal provocation" is not defined by statute. In contrast, we note that the phrase "adequate provocation" used in the offense of manslaughter, A.R.S. § 13–1103(A)(2) (2003), is statutorily defined as "mean[ing] conduct or circumstances sufficient to deprive a reasonable person of self-control." A.R.S. § 13–1101(4) (2003). Given the lack of a statutory definition for "verbal provocation," we assume that the legislature intended the word "provocation" in § 13–404(B)(1) to be given its ordinary meaning as found in dictionaries in common usage, for example: "1. the act of provoking. 2. something that provokes, esp. by inciting, instigating, angering, or irritating." Random House Webster's College Dictionary 1063–64 (2nd ed.1999). The meanings of "provoke" include: "1. To incite to anger or resentment. 2. To stir to action or feeling. 3. To give rise to; evoke: *provoke laughter.* 4. To bring about deliberately; induce: *pro-*

*voke a fight."* The American Heritage Dictionary of the English Language 1459 (3rd ed.1992). A threat to cause physical injury to another person is more than a mere expression of inciting words. Therefore, § 13–404(B)(1) does not preclude the recipient of such a threat from lawfully defending himself as permitted by the remainder of § 13–404(A).

4. Section 13–415 is a limited statutory codification of Arizona case law holding that prior acts of violence by the deceased are generally admissible as evidence of defendant's state of mind if the defendant either personally observed the acts or was aware of the acts before the homicide. *See, e.g., State v. Taylor,* 169 Ariz. 121, 123, 817 P.2d 488, 490 (1991); *State v. Jackson,* 94 Ariz. 117, 121, 382 P.2d 229, 231 (1963); *State v. Wallace,* 83 Ariz. 220, 223, 319 P.2d 529, 531 (1957). Indeed, when § 13–415 was added, the

286

believed that the victim's remarks were a threat that signaled his imminent use of deadly physical force against her and that the instruction based on § 13–404(B)(1) was inapplicable. The evidence at trial would have reasonably supported either one of these possibilities. Based on the jury's manslaughter verdict, the only definite inference that can be drawn is that the jury necessarily found that the evidence of self-defense did not preponderate in defendant's favor.[5]

## CONCLUSION

¶ 29 For the foregoing reasons set forth in this Opinion and the accompanying Memo-

randum Decision, we affirm defendant's conviction and sentence.

CONCURRING: LAWRENCE F. WINTHROP, Presiding Judge, and ROBERT R. MOON, Judge Pro Tempore.[6]

Recommended Arizona Jury Instruction for self-defense then in use required a jury to evaluate a defendant's claim of justification from the perspective of "a reasonable person in the defendant's *situation*." Recommended Arizona Jury Instruction (Criminal) 4.04 (1989) (emphasis added). Thus, § 13–415 made explicit that which had previously been implicit in such cases—that "the state of mind of a reasonable person under section 13–404, 13–405 and 13–406 [defense of a third person] shall be determined from the perspective of a reasonable person who has been the victim of those past acts of domestic violence." It is only in this narrow sense that § 13–415 modified existing law on self-defense.

5. Defendant further claims that the "confusion" resulting from the trial court's failure to modify

the instruction as she requested deprived her of a fair trial and due process in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article 2, Sections 4 and 24 of the Arizona Constitution. Because the instructions given by the trial court correctly set forth the law, defendant's constitutional argument fails.

6. NOTE: The Honorable Robert R. Moon, Judge Pro Tempore, was authorized by the Chief Justice of the Arizona Supreme Court to participate in the disposition of this appeal pursuant to Article 6, Section 3, of the Arizona Constitution and A.R.S. §§ 12–145 to 147 (2003).