IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

————————

**STATE OF ARIZONA,**
*Appellee,*

*v.*

**SOPHIA LEEANN RICHTER,**
*Appellant.*

————————

No. CR-17-0452-PR
Filed August 24, 2018

————————

Appeal from the Superior Court in Pima County
The Honorable Paul E. Tang, Judge
No. CR20135144-002
**REVERSED AND REMANDED**

Opinion of the Court of Appeals, Division Two
243 Ariz. 131 (App. 2017)
**VACATED IN PART**

————————

COUNSEL:

Mark Brnovich, Arizona Attorney General, Dominic Draye, Solicitor General, Joseph T. Maziarz, Chief Counsel, Criminal Appeals Section, Amy M. Thorson, Assistant Attorney General, Tucson, Michael T. O'Toole (argued), Phoenix, for State of Arizona

James L. Fullin, Pima County Legal Defender, Robb P. Holmes, Assistant Legal Defender (argued), Tucson, for Sophia Leeann Richter

David J. Euchner, Pima County Public Defender's Office, Tucson; and Nathan S. Benedict, Salt River Pima-Maricopa Indian Community Defense Advocate Office, Scottsdale, for Amicus Curiae Arizona Attorneys for Criminal Justice

————————

CHIEF JUSTICE BALES authored the opinion of the Court, in which VICE CHIEF JUSTICE BRUTINEL and JUSTICES TIMMER and BOLICK joined. JUSTICE LOPEZ, joined by JUSTICES PELANDER and GOULD, dissented in part.

_____

CHIEF JUSTICE BALES, opinion of the Court:

¶1        We consider whether an abuser's ongoing threats of harm over a three-month period may constitute a "threat or use of immediate physical force" under A.R.S. § 13-412(A) sufficient to permit the defendant to raise a duress defense to charges of abusing her children. We hold that such evidence can establish a threat supporting a duress defense. We also consider whether expert testimony regarding the psychological effects of an abuser's ongoing threats of harm may constitute observation evidence permissible under *Clark v. Arizona*, 548 U.S. 735 (2006), and *State v. Mott*, 187 Ariz. 536 (1997). We hold that, based on the limited record before us, the expert testimony proffered does not constitute permissible observation evidence.

## I.

¶2        Early one morning in November 2013, two sisters, ages twelve and thirteen, escaped out the window of their bedroom and fled to their neighbors' house, shouting that their stepfather had broken down their bedroom door and threatened them with a knife. The neighbors, who did not know the two girls lived in the neighborhood, let them in and called 911. The neighbors described the girls as disheveled, with matted hair and body odor.

¶3        Police went to the girls' house, where they found the parents, Sophia and Fernando Richter. Inside the house, police found Sophia's seventeen-year-old daughter locked inside a separate bedroom. They confirmed that the younger sisters' bedroom door was kicked in and the doorknob damaged. During their search, they found video cameras and covered air-conditioning vents in the girls' rooms, an internal alarm system, a knife near the master bedroom, and a five-gallon bucket containing pasta mixed with meat and food scraps in the refrigerator.

¶4        The three girls described horrible living conditions. They were always confined to their rooms and were monitored by video camera. They had to ask permission to use the bathroom and occasionally were not let out in time. They ate their meals, which mostly consisted of the pasta mix, in their rooms. They had piles of soiled clothing and bedding in their closets. They rarely brushed their teeth or bathed, and they described being spanked and hit with various objects. Recorded music was continually

played in their rooms to mask any noise they made. After being removed from school years earlier, they never returned. The younger sisters had not seen their older sister in over a year despite living in the same house.

¶5            A grand jury indicted Sophia and Fernando on separate counts of kidnapping and child abuse for each of the three girls (six counts total) alleged to have occurred between September 1, 2013, and November 26, 2013, the dates they lived in Pima County. Fernando was also charged with two counts of aggravated assault for his attacks on the younger sisters.

¶6            Before trial, Sophia gave notice that she intended to raise a duress defense. She and Fernando filed separate motions to sever their trials. The State opposed the motions and characterized Sophia's proposed duress defense and supporting expert testimony from psychologist Dr. Perrin as "diminished capacity" evidence that is prohibited by *Mott*, 187 at 540-41. Additionally, the State argued that Sophia's proposed evidence failed to demonstrate a threat of immediate physical force as required by A.R.S. § 13-412(A). Agreeing with the State, the trial court ruled that Dr. Perrin's proposed testimony "was essentially that Sophia was a battered woman" and was prohibited by *Mott*. The court also found that Sophia failed to offer evidence in support of a duress defense and denied the request to sever her trial.

¶7            During trial, the State moved in limine to preclude Sophia from presenting evidence that Fernando physically or emotionally abused her. The State repeated its arguments that Sophia could not establish immediacy of threat as required by § 13-412(A) and that "battered woman" evidence was impermissible under *Mott*. The court granted the State's motion and again precluded the duress defense, finding no immediacy of threat when the dates for the alleged offenses spanned eighty-six days from September through November 2013. Sophia objected to the court's ruling and, near the close of trial, again sought to testify about Fernando's abuse, making an offer of proof through counsel's avowal of proposed testimony and photographs showing numerous scars from knife wounds inflicted by Fernando. The trial court found her proffer insufficient and again precluded her from testifying about Fernando's abuse and introducing the photographs.

¶8            Fernando and Sophia were ultimately convicted as charged. Fernando's convictions and sentences were affirmed on appeal in *State v.*

*Richter*, 2 CA-CR 2016-0112, 2017 WL 491137, at *1 ¶ 3 (Ariz. App. Jan. 24, 2017) (mem. decision).

**¶9**      Sophia appealed, arguing that the trial court erred by restricting her trial testimony, precluding her duress defense, and preventing her expert from testifying. The court of appeals agreed, determining that the proposed testimony of Sophia and her expert was "admissible to show that she committed the charged offenses under duress." *State v. Richter*, 243 Ariz. 131, 137 ¶ 19 (App. 2017). Furthermore, the court concluded that "to the extent that Perrin's proposed testimony addressed mens rea, . . . it would be properly characterized as 'observation evidence,' which is not precluded by *Mott*." *Id.* ¶ 20. The court explained that such evidence is admissible under *Clark*, 548 U.S. at 770-71. *Richter*, 243 Ariz. at 137 ¶ 20. Finally, the court concluded that Sophia and Perrin's proposed testimony provided a legal basis for the duress defense. *Id.* at 139 ¶ 29.

**¶10**      We granted review to consider whether Fernando's threats and abuse of Sophia created a threat of immediate harm sufficient to support a duress defense and whether the proposed expert testimony was admissible as observation evidence. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

**II.**

**¶11**      We review a trial court's decision regarding the admissibility of evidence for abuse of discretion, *State v. Aguilar*, 209 Ariz. 40, 50 ¶ 29 (2004), and likewise review a trial court's decision to withhold a jury instruction, *State v. Bolton*, 182 Ariz. 290, 309 (1995). We review questions of law de novo. *In re Johnson*, 231 Ariz. 556, 557 ¶ 1 (2013).

**III.**

**¶12**      At trial, Sophia sought to introduce photographic and testimonial evidence regarding specific abusive events and the pattern of abuse that she experienced. She would have used such evidence to establish that she was "compelled to engage in the proscribed conduct by the threat or use of immediate physical force against" her or her children. *See* § 13-412(A). However, the trial court precluded her from introducing

4

the evidence, concluding it constituted prohibited diminished capacity evidence under *Mott*.

**¶13**　　　In *Mott*, a defendant sought to introduce "expert psychological testimony that as a battered woman, she was unable to form the requisite mental state necessary for the commission of the charged offenses." 187 Ariz. at 538. This Court barred the expert testimony, holding that "Arizona does not allow evidence of a defendant's mental disorder short of insanity either as an affirmative defense or to negate the *mens rea* element of a crime." *Id.* at 541. The Court noted that it previously "considered and rejected the defense of diminished capacity" and recognized that "the legislature is responsible for promulgating the criminal law." *Id.*; *see State v. Schantz*, 98 Ariz. 200, 212 (1965). Because the legislature has not provided an affirmative defense of diminished capacity, courts in our state are barred from considering diminished capacity evidence as an affirmative defense or to negate the mens rea element of a crime. *See* A.R.S. § 13-502(A); *see also State v. Leteve*, 237 Ariz. 516, 524 ¶ 20 (2015).

**¶14**　　　But Sophia did not seek to negate the mens rea of the charged crimes. Instead, she sought to argue that her intentional illegal conduct was justified because she was compelled to abuse her children by the threat or use of immediate physical force against her or her children. The Arizona Legislature has codified duress as a justification defense in § 13-412(A):

> Conduct which would otherwise constitute an offense is justified if a reasonable person would believe that he was compelled to engage in the proscribed conduct by the threat or use of immediate physical force against his person or the person of another which resulted or could result in serious physical injury which a reasonable person in the situation would not have resisted.

The legislature has clarified the nature of justification defenses: "Justification defenses under chapter 4 of [title 13] are not affirmative defenses. Justification defenses describe conduct that, if not justified, would constitute an offense but, if justified, does not constitute criminal or wrongful conduct." A.R.S. § 13-205(A). Once a defendant produces evidence supporting a justification defense, the state has the burden to "prove beyond a reasonable doubt that the defendant did not act with

justification." *Id.* (We note that the trial court here erroneously held Sophia to a higher standard inconsistent with § 13-205 when it concluded that she "carrie[d] the burden of proving that she acted under duress by a preponderance of evidence.")

**¶15** Because Sophia sought to assert a justification defense, the evidence of duress she would have introduced in support of that defense did not constitute "diminished capacity" evidence and was not prohibited by *Mott*. The trial court therefore erred by ruling that *Mott* precluded Sophia from presenting evidence in support of her duress defense to the jury.

**IV.**

**¶16** Regardless of the admissibility of Sophia's testimony under *Mott*, the State urges us to affirm the trial court's determination that Sophia's proffered evidence failed to establish the requisite immediacy under § 13-412(A), which provides that illegal conduct committed under duress is justified only when the harm threatened is immediate. We have previously characterized immediate threatened harm as "present, imminent and impending." *State v. Kinslow*, 165 Ariz. 503, 505-06 (1990); *see also State v. Jones*, 119 Ariz. 555, 558 (App. 1978).

**¶17** Although we have had few opportunities to consider what constitutes "present, imminent, and impending," other courts have found that an ongoing threat can satisfy that description for purposes of a duress defense. For example, a New Mexico trial court refused to give a duress jury instruction in the trial of a defendant charged with escape from prison. *Esquibel v. State*, 576 P.2d 1129, 1130 (N.M. 1978), *overruled on other grounds by State v. Wilson*, 867 P.2d 1175 (N.M. 1994). The New Mexico Supreme Court reversed, finding that "evidence of a prolonged history of beatings and serious threats toward [the] defendant by certain guards and prison personnel," the most recent of which occurred forty-eight to seventy-two hours before the defendant's escape, warranted a duress instruction. *Esquibel*, 576 P.2d at 1132. The court stated that "the passage of two to three days between threat and escape does not suffice to remove the defense of duress from the consideration of the jury." *Id.* at 1132-33. Furthermore, the court remarked that "[w]hat constitutes present, immediate and impending compulsion depends on the circumstances of each case." *Id.* at 1133. *Compare Kinslow*, 165 Ariz. at 506 (finding that defendant presented no evidence to show present, imminent, and impending threat despite "shoot

6

to kill" order when three weeks passed between defendant's escape from prison and alleged crimes, defendant knew that one of the escaped inmates had been captured nonviolently, and a police officer recognized defendant but did not draw weapon), *with Esquibel*, 576 P.2d at 1133.

¶18 The Ninth Circuit reached a similar conclusion in *United States v. Contento-Pachon*, 723 F.2d 691 (9th Cir. 1984). There, a defendant appealed a trial court's ruling precluding him from raising a duress defense to drug-trafficking charges. *Id.* at 693. Drug traffickers had approached the defendant in Colombia, proposing that he swallow cocaine-filled balloons and transport them to the United States. *Id.* The defendant initially refused but ultimately relented after the drug traffickers mentioned facts about his personal life and told him that "his failure to cooperate would result in the death of his wife and three year-old child." *Id.* The Ninth Circuit reversed, finding that the defendant presented sufficient evidence to present a triable issue of fact to the jury as to whether the threat of injury was present, immediate, or impending. *Id.* at 694.

¶19 Similarly, in *United States v. Chi Tong Kuok*, 671 F.3d 931 (9th Cir. 2012), a defendant accused of illegally exporting military communications equipment sought to raise a duress defense. Although the defendant's illegal conduct began in about 2000, the government's case focused on evidence that, "over the course of a two-and-a-half-year period between 2006 and 2009, [the defendant] tried to purchase from vendors in the United States various types of communication equipment commonly used by the U.S. military." *Id.* at 935. In his opening statement, the defendant enumerated threats to his family dating to before 2002. *Id.* Nevertheless, the trial court precluded him from raising a duress defense. *Id.* Again, the Ninth Circuit reversed, concluding that the threats to his family were "immediate and serious" and thus sufficient to support a duress defense. *Id.* at 947-48.

¶20 These cases persuade us that an ongoing threat of harm can be sufficiently immediate and present for purposes of a duress defense even when the threat precedes the illegal conduct by several days (*Esquibel*), the coercing party is physically removed from the defendant (*Contento-Pachon*), or the threat is initiated and then repeatedly renewed over several years (*Chi Tong Kuok*).

**¶21** To be sure, the "present, imminent, and impending" standard includes only conduct that would compel a "reasonable person in the situation," § 13-412(A), to act in duress. Therefore, a threat may not be vague or undetailed, *see Chi Tong Kuok*, 671 F.3d at 948, and generalized fear does not suffice, *see United States v. Sixty Acres in Etowah Cty.*, 930 F.2d 857, 860-61 (11th Cir. 1991) (concluding that defendant's generalized fear of husband insufficient to support duress defense even when husband's "presence induced fear, anxiety and fierce discomfort in the members of his household").

**¶22** The State concedes that, in theory, a continuing threat over a three-month period could serve as the basis for a duress defense. It argues that here, however, Sophia has merely asserted that she had a generalized fear of her husband. Accordingly, the State reasons, although evidence of Sophia's abuse may be relevant to sentencing as a mitigating factor under A.R.S. § 13-701(E)(3), it does not support a duress defense. We disagree.

**¶23** Through counsel, Sophia proffered that "she was under immediate threat of physical harm to herself and/or to her children," and that this threat was ongoing. She stated that even when she went grocery shopping, she was accompanied by Fernando's mother and "[Sophia's] phone was required to be on at all times in order that he could hear what was going on." She further proffered that "she believed that if she resisted, that she would either be seriously harmed or killed, or that her children would as well." She submitted evidence of wounds and blood on her body that police documented on the day of her arrest. She also would have introduced evidence that, when she stood up to Fernando on a family trip, he threw her out of the hotel room by her hair. (Although the court of appeals considered Dr. Perrin's report as part of Sophia's proffer of duress evidence, we decline to do so. Sophia did not refer to Dr. Perrin's report or his potential testimony during her proffer of duress at trial and only did so during her earlier motion to sever.)

**¶24** "[A] defendant is entitled to an instruction on any theory of the case reasonably supported by the evidence." *State v. Lujan*, 136 Ariz. 102, 104 (1983). In the context of justification, we have articulated a low threshold for evidentiary sufficiency: a justification instruction is warranted "if the record contains the 'slightest evidence'" of justification. *State v. Carson*, 243 Ariz. 463, 465 ¶ 9 (2018) (quoting *State v. King*, 225 Ariz. 87, 90 ¶ 14 (2010)); *see also Lujan*, 136 Ariz. at 104 (reasoning that a defendant is

entitled to a jury instruction if there is the "slightest evidence of justification"). Here, Sophia supported her claim that she and her children were under the threat of immediate physical harm with proffered evidence of specific injuries and abuse. In so doing, she provided the slightest evidence of duress, and her proffer was therefore sufficient to support a duress defense. Thus, the trial court erred when it precluded her from raising a duress defense and from introducing evidence in support of that defense.

¶25    The dissent would affirm the trial court, arguing that our decision does not give effect to § 13-412(A)'s limitation of duress to circumstances involving threats of "immediate physical force." *Infra* ¶ 43. Essentially, the dissent would shift to Sophia the burden of proving her defense before trial, in direct contradiction of § 13-205. Far from "rendering superfluous" the immediacy requirement for duress, we give full effect to § 13-412(A) when we allow the jury to determine if a reasonable person, in Sophia's situation, would have believed that Fernando was threatening immediate physical force against her or her children, and would not have resisted.

¶26    The dissent would also deny Sophia the opportunity to introduce evidence in support of a duress defense because she failed to prove, before trial, that she had no "reasonable legal alternative" to her otherwise illegal conduct. *Infra* ¶¶ 53-56. Whereas "no reasonable alternative" is a statutory element of necessity, it is not a statutory element of duress. *Compare* A.R.S. § 13-417(A), *with* A.R.S. § 13-412(A). Although evidence of whether a "reasonable alternative" was available to Sophia considering her circumstances may be relevant to the jury's assessment of whether her conduct was ultimately reasonable, she has no statutory burden to prove the dissent's additional element. (The dissent relies on *Kinslow*, but that decision preceded the enactment of current § 13-205 and our decision in *Carson*.)

¶27    The State argues that admitting evidence of Fernando's abusive acts would transform the duress defense from an objective standard to a subjective standard. Sophia responds that evidence of abuse is relevant to informing the inquiry of whether a reasonable person in her situation would have likewise felt compelled to act under duress. *See* A.R.S. § 13-412(A). Amicus agrees, positing that an objective standard still

requires consideration of the defendant's circumstances when determining the reasonableness of his or her conduct.

¶28        Justification defenses in Arizona "use objective standards that depend on the beliefs of a 'reasonable person' in the defendant's circumstances rather than the defendant's subjective beliefs." *Carson*, 243 Ariz. at 465 ¶ 9; *see* A.R.S. § 13-412(A). As an example, "Arizona courts have long held that a murder defendant who defends on the basis of justification should be permitted to introduce evidence of specific acts of violence by the deceased if the defendant either observed the acts himself or was informed of the acts before the homicide." *State v. Taylor*, 169 Ariz. 121, 124 (1991). This evidence demonstrates the defendant's knowledge of the victim's violent tendencies and shows that the defendant was "justifiably apprehensive" of the victim. *Id.*

¶29        This same logic applies to establishing a duress defense. Knowledge of the circumstances under which the defendant committed the alleged crimes is essential to the jury's determination of whether the defendant's actions were reasonable. *See United States v. Nwoye*, 824 F.3d 1129, 1137 (D.C. Cir. 2016) ("Reasonableness . . . is not assessed in the abstract. Rather, any assessment of the reasonableness of a defendant's actions must take into account the defendant's 'particular circumstances,'" which include "facts known to the defendant at the time in question, such as the defendant's knowledge of an assailant's violent reputation."). Just as the jury in *Esquibel* should have considered the prolonged history of beatings and threats the defendant suffered, so too the jury here should have been permitted to consider the specific instances and pattern of abuse that Fernando inflicted on Sophia. Indeed, the plain language of § 13-412(A) itself requires that a duress claim be evaluated from the perspective of a reasonable person in the defendant's situation.

¶30        To be sure, the introduction of evidence of past incidents of abuse should not transform the duress defense into a subjective inquiry of whether a specific defendant was unusually susceptible to succumbing to otherwise implausible threats. Therefore, the proper inquiry for the jury here is whether a reasonable person subjected to the same threats and pattern of abuse would have believed he or she was compelled to engage in the same illegal conduct.

¶31        Noting that A.R.S. § 13-415 provides for the admission of evidence of past acts of domestic abuse for other justification defenses (self-defense, defense of a third party, defense of property), but not for duress, the State argues that the legislature intended to preclude such evidence from duress cases.  The State's argument is unpersuasive.  Section 13-415 concerns only defenses in which the perpetrator of domestic violence is the crime victim.  *See State v. Vogel*, 207 Ariz. 280, 285 ¶ 28 n.4 (App. 2004) (noting that § 13-415 codifies "case law holding that prior acts of violence by the deceased are generally admissible as evidence of defendant's state of mind").  It is therefore unsurprising that § 13-415 does not refer to the duress defense, which applies only when third parties are the victims.  Consequently, we decline to construe this statute's codification of the admissibility of domestic violence evidence for self-defense as implicitly barring the admission of such evidence for duress.  *Cf.* Ariz. R. Evid. 402 (noting general admissibility of relevant evidence absent contrary provision in constitution, statute, or rule).

## V.

¶32        Just as the trial court precluded Sophia from presenting her own testimony regarding Fernando's abuse, it also determined that testimony from her expert, Dr. Perrin, would be inadmissible under *Mott* as so-called "psychological evidence."  The court of appeals concluded, however, that "to the extent that Perrin's proposed testimony addressed mens rea, . . . it would be properly characterized as 'observation evidence.'" *Richter*, 243 Ariz. at 137 ¶ 20.

¶33        In *Clark*, the United States Supreme Court concluded that *Mott* does not prohibit the introduction of "observation evidence" "to rebut the prosecution's evidence of *mens rea*."  548 U.S. at 760.  The Court framed its definition of observation evidence in the context of the defendant's alleged crime of homicide of a police officer:

> [T]here is "observation evidence" in the everyday sense, testimony from those who observed what [the defendant] did and heard what he said; this category would also include testimony that an expert witness might give about [the defendant's] tendency to think in a certain way and his behavioral characteristics.  This evidence may support a professional diagnosis of mental disease and in any event is

the kind of evidence that can be relevant to show what in fact
was on [the defendant's] mind when he fired the gun.

*Id.* at 757. The Court gave several examples of observation evidence in
*Clark*: "[the defendant's] behavior at home and with friends, his expressions
of belief around the time of the killing that 'aliens' were inhabiting the
bodies of local people . . . , [and] his driving around the neighborhood
before the police arrived." *Id.* The Court clarified that "observation
evidence can be presented by either lay or expert witnesses," explaining
that "an expert witness might offer . . . descriptions of a defendant's
tendency to think in a certain way or his behavioral characteristics." *Id.* at
757-58, 760. The Court admitted, however, that its broad definitions of the
evidentiary categories discussed in *Mott* did not delineate the margins of
those categories. Instead, it left that task for Arizona courts. *See id.* at 759.

¶34 This Court has permitted a defendant to introduce
observation "evidence about his [or her] behavioral tendencies to show that
he [or she] possessed a character trait of acting reflexively in response to
stress." *Leteve*, 237 Ariz. at 524 ¶ 21 (quoting *State v. Mott*, 187 Ariz. at 544)
(internal quotation marks omitted); *see also id.* ¶ 24 (holding that it was error
to preclude expert evidence regarding a defendant's character trait for
impulsivity to rebut premeditation); *State v. Christensen*, 129 Ariz. 32, 34-35
(1981) (holding that it was error to preclude expert evidence that defendant
"had difficulty dealing with stress and in stressful situations his actions
were more reflexive than reflective" to establish that he "acted impulsively"
and to allow the jury to infer that a homicide was not premeditated).

¶35 The record does not clearly identify what testimony Sophia
would have elicited from Dr. Perrin. He prepared an abbreviated initial
report of his psychological examinations of Sophia for the limited purpose
of Sophia's motion to sever. The report detailed a horrific pattern of
physical and psychological abuse that was, in a word, devastating.
However, because the trial judge ruled before trial that this expert
testimony was precluded by *Mott*, Sophia failed to further develop at trial
what her expert would have testified to.

¶36 Based on the limited record before us, Dr. Perrin's report does
not match the reflexive or impulsive observation evidence that this Court
concluded was admissible in *Leteve* or *Christensen*. Although observation
evidence is broader than testimony about impulsivity, Dr. Perrin's

testimony, as proffered, would not have been admissible as "observation evidence." We add that, even if his expert testimony were admissible, Dr. Perrin could not present hearsay testimony on direct examination about what Sophia told him months after being charged. That is, Dr. Perrin should not, under the guise of observation evidence, be permitted to serve as a mere conduit for otherwise inadmissible testimony. *See State v. Carlson*, 237 Ariz. 381, 391-92 ¶¶ 26-29 (2015) (upholding exclusion of expert's testimony that defendant said he falsely confessed).

¶37        We note that *Clark*, *Leteve*, and *Christensen* all uphold the admissibility of observation evidence to rebut mens rea, which is necessarily a subjective element. Because duress requires an objective inquiry, and because evidence of "a defendant's tendency to think in a certain way or his [or her] behavioral characteristics," *Clark*, 548 Ariz. at 760, is inherently subjective, we conclude that observation evidence is likely not admissible to support a duress defense. *Cf. State v. Stark*, 122 Ariz. 531, 533-34 (1979) (holding, under former duress statute, that psychiatric testimony "delved into the defendant's subjective mental state and was therefore properly excluded"). If Dr. Perrin's testimony is again proffered, we leave it to the trial court on remand to decide, consistent with this opinion, whether he can offer any admissible evidence.

## VI.

¶38        For the foregoing reasons, we vacate paragraphs 6-32 of the court of appeals' opinion, reverse Sophia Richter's convictions and sentences, and remand this case for a new trial.

LOPEZ, J., joined by PELANDER, J. and GOULD, J., dissenting in part.

**¶39** The majority holds that Sophia was entitled to raise a duress defense under A.R.S. § 13-412(A) to charges of kidnapping and abusing her three minor children for three months because "ongoing threats of harm" by her abusive husband, Fernando, constituted a "threat or use of immediate physical force" under the statute. *Supra* ¶¶ 1, 15. I respectfully dissent because Sophia failed to satisfy the duress statute's requirement that she demonstrate she acted in response to a "threat or use of immediate physical force" (the "immediacy requirement"). *See* § 13-412(A). Thus, I would uphold the trial court's denial of Sophia's duress defense and affirm her convictions and sentences.[1]

## I. The Duress Defense

**¶40** The majority expands the availability of the duress defense in contravention of the statute's text, our case law interpreting it, the justification defense statutory scheme, and the law's underlying policy and reasoning which narrow the defense's application. These limitations on the duress defense exist because, unlike other justification defenses, it excuses crimes against innocent victims. *See e.g.*, A.R.S. § 13-404(A) (explaining that a person is justified in using or threatening force in defense of *himself*).

**¶41** The rationale for the duress defense is that "even though [the defendant] has done the act the crime requires and has the mental state which the crime requires, his conduct which violates the literal language of the criminal law is justified because he has thereby avoided a harm of greater magnitude." *State v. Jeffrey*, 203 Ariz. 111, 114 ¶ 10 (App. 2002) (quoting 1 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 5.3, at 614 (2d ed. 1986)). For this reason, the use of the duress defense to justify infliction of physical harm against an innocent person is circumscribed. For example, the duress defense is unavailable for offenses

---

[1] I concur in the majority's holding, *supra* ¶ 15, that "[b]ecause Sophia sought to assert a justification defense, the evidence of duress she would have introduced in support of that defense did not constitute 'diminished capacity' evidence and was not prohibited by *Mott*," contrary to the trial court's ruling.

involving "homicide or serious physical injury." § 13-412(C). The paramount interest in protecting innocent third parties even precludes self-defense in certain circumstances involving harm to innocent victims. *See, e.g.*, A.R.S. § 13-401(A) (barring applicability of self-defense theory in prosecution for reckless injury of an innocent third party). Consequently, even if a person's life is immediately threatened, he is not entitled to kill or seriously physically injure another innocent person as an act of self-preservation. If a person's only recourse for self-preservation is to inflict such harm, his options are to retreat, to seek assistance from law enforcement, to engage in self-defense, or to do nothing.

¶42 Here, § 13-412(C) does not preclude Sophia's duress defense because she was not charged with inflicting serious physical injury on her children, but her conduct skews precariously close to the line. After Sophia's arrest, medical professionals determined that her children suffered from severe neglect, had scars consistent with strikes from "belts or wires," "lacked muscle development," suffered "skin irritation caused by poor hygiene" and dental problems, and one child suffered from a speech impediment resulting from forced isolation. All the children suffered psychological trauma. This case, where the defendant's conduct harmed innocent victims directly or through acquiescence, perfectly illustrates the reason for narrow application of the duress defense. *See, e.g.*, *State v. Riker*, 869 P.2d 43, 51 (Wash. 1994) (noting that evidence of battered woman syndrome is permitted to support self-defense, but refusing to allow it to support a duress defense because it involves harm to an innocent third party and "[t]he more stringent requirements for the duress defense are a result of the more socially harmful outcome allowed by this defense, and reflect society's conclusion that . . . the defense should be limited").

¶43 The duress statute's text, and our case law interpreting it, impose a strict temporal threat requirement on the duress defense. Arizona did not adopt the Model Penal Code's ("MPC") duress language wholesale, but instead included the requirement of a "threat or use of *immediate* physical force." § 13-412(A) (emphasis added). By adding this immediacy requirement in § 13-412(A), an intentional deviation from the MPC on which the statute was otherwise based, the legislature intended to narrow its application. The Court must give meaning to every word in the statute, including "immediate." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012) (discussing the "surplusage

canon," which provides that "[i]f possible, every word and every provision is to be given effect . . . None should be ignored.  None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence").  But under the majority's view, in which immediacy is stretched beyond its plain meaning without clear parameters, it is difficult to imagine a scenario in which a proffered duress defense would qualify under the MPC but not under Arizona's more restrictive statute, effectively rendering superfluous our statute's immediacy requirement.

¶44        The majority acknowledges that we have previously characterized an immediate threat warranting a duress instruction as "present, imminent and impending."  *Supra* ¶ 16 (quoting *State v. Kinslow*, 165 Ariz. 503, 505–06 (1990)).  That prior description of "immediate" in the duress statute is consistent with its common usage and legal definitions. *See Immediate*, Webster's Second New International Dictionary 1245 (1949) (defining "immediate" as "occurring without delay; made or done at once; instant"); *see also Immediate*, Black's Law Dictionary 866 (10th ed. 2014) (defining "immediate" as (1) "[o]curring without delay; instant," (2) "[n]ot separated by other persons or things," or (3) "[h]aving a direct impact; without an intervening agency").

¶45        Thus, "the threat or use of *immediate* physical force," § 13-412(A) (emphasis added), which implies a "present, imminent and impending" action, *Kinslow*, 165 Ariz. at 505–06, describes an event that is about to happen, *see Present*, Webster's Second New International Dictionary ("Webster's Second") 1955 (1949) (defining "present" as "now existing, or in process"); *see also Imminent*, Webster's Second 1245 (1949) (defining "imminent" as "threatening to occur immediately; near at hand"). Further, showing a threat of immediate harm is distinct from showing a threat of eventual harm, as "all threats imply a risk of eventual harm," and "such a conclusion would functionally erase the imminence element" from the statute.  *State v. Medina*, 244 Ariz. 361, 364 ¶¶ 9–10 (App. 2018) (discussing the immediacy requirement of a necessity defense under A.R.S. § 13-417(A) and stating that "imminence is at the heart of the defense of necessity—without it, a necessity does not exist").

¶46        In this case, Sophia proffered no evidence that Fernando threatened or used physical harm which compelled her to continuously

abuse her children for the entire three-month period alleged in the indictment, if at all. Sophia argues, without specific or direct factual support in the record, that Fernando's "constant" and "unrelenting" threats constitute the slightest evidence of immediacy necessary to present the defense because she "lived in a constant state of fear." *State v. Richter*, 243 Ariz. 131, 135 ¶ 8 (App. 2017) (internal quotation marks omitted). But Sophia failed in her skeletal offer of proof or otherwise to present any evidence of specific threats during the relevant period, and her subjective, generalized fear of Fernando, without specific facts indicating immediacy, does not justify a duress defense. *See, e.g., United States v. Sixty Acres in Etowah Cty.*, 930 F.2d 857, 860–61 (11th Cir. 1991) ("We may not substitute . . . a vaguely-defined theory of 'battered wife syndrome' for the showing of duress courts have always required to excuse otherwise criminal conduct" because generalized fear "cannot provoke the application of a legal standard whose essential elements are absent.").

¶47 To shore up her claim, during trial Sophia made an extremely limited and general offer of proof through her counsel. Sophia presented only two incidents in which Fernando physically assaulted her. First, she proffered evidence that on the night of her arrest, Fernando burned and scratched her chest and arm, although she initially told police that her injuries were self-inflicted. Second, Sophia alleged that during a family vacation some time before the charged child abuse, Fernando threw her out of a hotel room by her hair when she attempted to protect her children.

¶48 Sophia's limited proffered evidence of abuse fails to establish immediacy for two reasons. First, she offered no evidence that either incident resulted from her refusal to follow Fernando's command that she abuse her children. Second, although deplorable, neither incident constitutes a continuous threat of immediate harm sufficient to justify Sophia's three-month systematic abuse of her children; the first incident occurred before the charged offenses, and the incident on the night of her arrest occurred after the child abuse for which she was convicted.

¶49 Even if we were to consider the hotel incident (which allegedly occurred before the relevant period of the charged offenses resulting in Sophia's convictions) as evidence of Fernando's pattern of abuse, evidence also showed that Sophia had opportunities to summon assistance or to escape with her children from Fernando during that same

17

period. For example, Sophia went grocery shopping alone with a neighbor before her family moved to Tucson and, during the move, she drove her car with her daughters while Fernando separately drove a moving truck. Thus, the attenuated hotel incident, undermined by countervailing evidence of reasonable alternatives to abusing her children, does not satisfy the immediacy requirement.

¶50 The majority, recognizing Sophia's failure to satisfy the statute's strict immediacy requirement, relies upon distinguishable New Mexico and federal cases to stretch our previous description of immediate threats to include perceived generalized ongoing threats. *Supra* ¶¶ 17–20. In doing so, the majority expands the scope of an immediate threat beyond its reasonable meaning, effectively eliminates the statute's express immediacy requirement, and undermines the statute's narrow application of the duress defense.

¶51 In *Esquibel v. State*, the New Mexico Supreme Court held that a duress instruction was warranted in a prosecution for prison escape because the defendant presented "evidence of a prolonged history of beatings and serious threats" by certain prison personnel, the most recent of which occurred a mere two or three days before the defendant's escape. 576 P.2d 1129, 1132 (N.M. 1978), *overruled on other grounds by State v. Wilson*, 867 P.2d 1175 (N.M. 1994). Unlike the present case, *Esquibel* involved a specific recent threat and the defendant arguably lacked a viable option to report the threat to prison authorities because he had been threatened and beaten by other personnel in the same facility. *Id.*

¶52 In *United States v. Contento-Pachon*, the defendant trafficked narcotics in response to death threats by a drug cartel, 723 F.2d 691, 693 (9th Cir. 1984), and in *United States v. Chi Tong Kuok*, the defendant attempted to illegally import restricted military technology as a result of similar threats and coercion by an authoritarian regime, 671 F.3d 931, 935–36 (9th Cir. 2012). Although the defendants were subjected to "ongoing threats" that lacked temporal immediacy and emanated from remote sources, the Ninth Circuit held that the defendants were entitled to duress instructions, in part, because their criminal conduct was reasonable in light of the perceived

futility of seeking relief from allegedly corrupt law enforcement authorities. *See Contento-Pachon*, 723 F.2d at 693–94; *Chi Tong Kuok*, 671 F.3d at 948.

**¶53** The majority relies on *Esquibel*, *Contento-Pachon*, and *Chi Tong Kuok* for the proposition that ongoing threats, temporally remote from the charged crime, can satisfy § 13-412(A)'s immediacy requirement. *Supra* ¶ 20. But as the majority notes, context matters. *Supra* ¶ 17 ("What constitutes 'present, immediate and impending' compulsion depends on the circumstances of each case." (quoting *Esquibel*, 576 P.2d at 1133)). The threats in these cases must be viewed in the context of the defendants' inability to escape them: "[I]f there was a reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal act and also to avoid the threatened harm,' the defenses [of duress and necessity] will fail." *See Kinslow*, 165 Ariz. at 506 (quoting *United States v. Bailey*, 443 U.S. 394, 410 (1980)).

**¶54** The fact that an ongoing threat lasting over a three-month period *may* constitute a threat of "immediate physical force," § 13-412(A),— if the threat compels the crime the entire time and reasonable legal alternatives to committing the crime are unavailable—does not advance Sophia's position. Unlike the defendants in *Esquibel*, *Contento-Pachon*, or *Chi Tong Kuok*, Sophia did not allege futility in reporting Fernando's threats to law enforcement as a reasonable alternative to abusing her children. The majority ignores the factual differences between this case and *Esquibel*, *Contento-Pachon*, and *Chi Tong Kuok* and disregards more factually analogous cases in which other courts have denied a duress instruction. *See, e.g.*, *State v. Lopez-Navor*, 951 A.2d 508, 511–12 (R.I. 2008) (refusing a duress instruction for a defendant who alleged that her boyfriend "threatened and intimidated her" into neglecting and abusing her child, as failing to report the situation did not "excuse[] her conduct"); *Campbell v. State*, 999 P.2d 649, 659–60 (Wyo. 2000) (finding that general evidence of years of physical abuse by her boyfriend did not establish a "present, imminent or impending" threat sufficient to permit defendant to raise a duress defense to a child endangerment charge).

**¶55** Although the majority and Sophia emphasize the circumstances when it would have been difficult or impossible for her to seek assistance, *see supra* ¶ 23, the evidence demonstrates that she had opportunities during the three-month period to escape or notify law

enforcement, family, neighbors, or strangers during outings from her house where her children were confined. For example, Sophia had contact with her mother and, as she concedes, occasionally went to the grocery store with her mother-in-law. Despite Fernando's alleged omnipresence, those situations afforded Sophia an opportunity to summon help or contact the police. Although Sophia claimed that she believed Fernando's mother acted as his agent in the abuse, his mother was not charged with abusing Sophia's children and testified that she was unaware of the abuse. In short, the record shows that Sophia had a reasonable, legal alternative to harming her children during the three-month period of abuse. This alone forecloses the duress defense. *See, e.g.*, *Kinslow*, 165 Ariz. at 506 (affirming trial court's denial of duress defense where defendant's belief that he had no reasonable opportunity to escape the threatened harm without committing his subsequent crimes was "wholly implausible").

¶56 The majority essentially argues that evidence of a reasonable alternative to Sophia abusing her children is irrelevant as to whether she was entitled to a duress instruction because it is not an element of the duress defense. *Supra* ¶ 26. This argument is unconvincing. First, the majority bolsters its conclusion that Sophia satisfied the immediacy requirement by emphasizing her claim that she was constantly under Fernando's control and, thus, implicitly incapable of summoning assistance. *Supra* ¶ 23. Second, as discussed, the out-of-state cases the majority cites to expand this Court's existing definition of immediacy rely, in part, on the absence of a reasonable alternative to committing the crime. *Supra* ¶¶ 17–20. Third, this Court in *Kinslow* affirmed a trial court's denial of a duress defense based upon our conclusion that the defendant's belief "that he had no reasonable alternative to escape the threatened harm without committing his subsequent crimes" was "implausible." *Kinslow*, 165 Ariz. at 506. The majority's approach represents a further departure from *Kinslow* as it would entitle a defendant to raise a duress defense, as justification for harming an innocent victim, even when the evidence shows that the defendant had a reasonable alternative to inflicting such harm.

¶57 The majority also posits that denying Sophia's requested duress instruction shifts "to Sophia the burden of proving her defense before trial, in direct contradiction of [A.R.S.] § 13-205." *Supra* ¶ 25. But the majority's view conflates two issues: a defendant's entitlement to raise a duress defense, which is resolved by the trial court based on the specific

evidence proffered to support the defense, and the allocation of the burden of proof at trial once the defense is raised with sufficient supporting evidence. Contrary to the majority's position, as *Kinslow* and every case denying a defendant's requested duress instruction illustrates, a defendant first must proffer sufficient evidence to warrant a justification instruction. Only after clearing this initial hurdle does § 13-205's burden allocation become relevant. For this reason, the statute does not diminish *Kinslow's* relevance and application here. That the state bears the burden of disproving justification after a defendant properly raises the defense sheds no light on the core issue in this case—whether Sophia presented the slightest evidence to support a duress defense and related jury instruction. The majority's invocation of § 13-205 to circumvent the limitations imposed by § 13-412(A) on the duress defense is unpersuasive.

**¶58** Given Sophia's generalized, inadequate offer of proof, the trial court correctly precluded her from presenting a duress defense and introducing evidence thereon because she failed to satisfy the statute's immediacy requirement and had a reasonable legal alternative to committing the crimes.

**¶59** Having held that Sophia was entitled to raise a duress defense because she satisfied the immediacy requirement, the majority next addresses the scope of the evidence of abuse suffered by Sophia admissible to support the defense. *Supra* ¶¶ 28–29. The majority reasons that "[k]nowledge of the circumstances under which the defendant committed the alleged crimes is essential to the jury's determination of whether the defendant's actions were reasonable." *Supra* ¶ 29. This is precisely what the statute requires. *See* § 13-412(A) (determining the actions of "a reasonable person in the situation"). But, as the majority notes, the duress defense uses an objective standard that applies the beliefs of "a 'reasonable person' in the defendant's circumstances rather than the defendant's subjective beliefs." *Supra* ¶ 28 (quoting *State v. Carson*, 243 Ariz. 463, 465 ¶ 9 (2018)). As such, the majority properly clarifies that "the introduction of evidence of past incidents of abuse should not transform the duress defense into a subjective inquiry of whether a specific defendant was unusually susceptible to succumbing to otherwise implausible threats." *Supra* ¶ 30.

**¶60** The majority rejects the State's argument that A.R.S. § 13-415, which provides for the admission of past acts of domestic abuse and

21

modifies the reasonableness standard for certain justification defenses such as self-defense, use of deadly physical force, or defense of a third person, evinces legislative intent, by omission, to preclude such evidence from the duress defense. *Supra* ¶ 31. The statute provides that the state of mind of a reasonable person invoking those other justification defenses "shall be determined from the perspective of a reasonable person who has been a victim of . . . past acts of domestic violence." § 13-415. The majority dismisses the statute as a limited statutory codification of Arizona "case law holding that prior acts of violence by the deceased are generally admissible as evidence of a defendant's state of mind." *Supra* ¶ 31 (quoting *State v. Vogel*, 207 Ariz. 280, 285 ¶ 28 n.4 (App. 2004)). But *Vogel* did not address whether prior acts of domestic violence are admissible in duress cases, and the legislature's failure to include the duress defense in § 13-415 or to provide in § 13-412 (or otherwise) language similar to § 13-415 should not be so casually dismissed. *See, e.g.*, *Campbell*, 999 P.2d at 660 (holding that a statute permitting evidence of battered woman syndrome does not apply to a defense of coercion and duress where its plain language "expressly limits its reach to the affirmative defense of self-defense").

¶61 Because § 13-415 serves as the statutory vehicle to introduce evidence of domestic abuse for self-defense cases and modifies the reasonableness standard, we can infer that the absence of a statutory counterpart demonstrates a lack of legislative intent to admit such evidence in duress cases. To extend § 13-415's modified reasonableness standard to the duress defense not only rewrites that statute, but also overrides § 13-412(A)'s express objective reasonableness standard. If the legislature intended to modify the reasonableness standard for defendants in duress cases, it could have done so. *See, e.g.*, *Champlin v. Sargeant in & for Cty. of Maricopa*, 192 Ariz. 371, 374 ¶ 16 (1998) ("[T]he expression of one or more items of a class indicates an intent to exclude omitted items of the same class.").

¶62 Declining to extend § 13-415's modified reasonable person standard to duress cases does not necessarily preclude a defendant entitled to raise a duress defense from introducing otherwise admissible evidence of abuse, such as percipient witness testimony, to the extent it is relevant to the jury's assessment under § 13-412(A) of whether the defendant acted as a reasonable person in the situation. But § 13-415 does more than place a juror in the defendant's situation; it places a juror in the defendant's mind

22

by commanding the juror to assess a defendant's reasonableness from the perspective of a domestic violence victim. In other words, § 13-415 designates a defendant as a domestic violence victim and instructs the jury to assess the case from that perspective. This is a significant departure from § 13-412(A)'s objective reasonableness standard. The more permissive standard under § 13-415 is understandable because it involves justification for violence against an alleged aggressor, whereas § 13-412(A) excuses crimes against an innocent person. The duress defense's limiting reasonableness standard was the legislature's choice and we are duty-bound to respect it. *Cf. State v. Gray*, 239 Ariz. 475, 480 ¶ 21 (2016) (stating that entrapment is a statutory defense defined and created by the legislature and that reconsidering the defense's limits is "within the purview of the legislature rather than the courts").

**¶63** I concur in the majority's conclusion, *supra* ¶ 23, that the court of appeals erred in considering Dr. Perrin's report or his potential testimony in assessing Sophia's proffer of duress at trial. The court of appeals' position, which would permit expert testimony concerning Sophia's psychological maladies, illustrates the flaw in considering such evidence to determine whether the immediacy requirement is satisfied. The court reasoned that, "although the issue may be close, Sophia's *and* [Dr.] Perrin's proposed testimony provided a legal basis for the duress defense." *Richter*, 243 Ariz. at 137 ¶ 29 (emphasis added). In other words, without expert testimony that Sophia, as a PTSD sufferer due to Fernando's abuse, was uniquely vulnerable to his threats and thus incapable of recognizing and pursuing reasonable, legal alternatives to abusing her children—like calling the police—the duress defense would be off the table. This is precisely the type of subjective analysis and outcome § 13-412(A)'s objective standard forbids.

## II.    Observation Evidence

**¶64** The majority holds that, "[b]ased on the limited record before us, Dr. Perrin's report does not match the reflexive or impulsive observation evidence that this Court concluded was admissible in *Leteve* or *Christensen*," and that "Dr. Perrin should not, under the guise of observation evidence, be permitted to serve as a mere conduit for otherwise inadmissible testimony." *Supra* ¶ 36. I concur in the majority's conclusion that, on the record before us, Dr. Perrin's testimony would not have been admissible. Further, I agree with the majority that, although observation evidence is

admissible to rebut evidence of mens rea, *Clark v. Arizona*, 548 U.S. 735, 760 (2006), it is likely not admissible to support a duress defense because it involves subjective evidence of a defendant's mindset and is, thus, inconsistent with § 13-412(A)'s objective standard. *Supra* ¶ 37; *cf. United States v. Willis*, 38 F.3d 170, 175 (5th Cir. 1994) (holding that "[e]vidence that the defendant is suffering from the battered woman's syndrome is inherently subjective" because "such evidence is usually consulted to explain why this particular defendant succumbed when a reasonable person without a background of being battered might not have. Specifically, battered woman's syndrome evidence seeks to establish that, because of her psychological condition, the defendant is unusually susceptible to the coercion"); *State v. Van Dyke*, 825 A.2d 1163, 1170–72 (N.J. App. 2003) (emphasizing the objective standard of a duress defense and declining introduction of PTSD evidence, as it "would inevitably allow the jury to measure defendant's conduct by a standard other than the norm governing the general population. Such a standard is beyond the contemplation of the duress defense and out-of-step with accepted principles of criminal liability").

### III.   Conclusion

**¶65**        Because Sophia did not offer the slightest evidence of a requisite threat or use of immediate physical force to justify kidnapping and abusing her children over the three-month period, I would find that she is precluded from presenting the duress defense. Thus, I would uphold the trial court's ruling to that effect and affirm Sophia's convictions and sentences.