**Reverse and Remand; Opinion Filed August 29, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00271-CR

### RICKY MORENO, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 283rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F17-00878-T**

## OPINION

Before Chief Justice Burns, Justice Myers, and Justice Molberg
Opinion by Justice Myers

A jury convicted appellant Ricky Moreno of aggravated kidnapping and assessed

punishment at forty-five years' imprisonment and a $10,000 fine. In ten issues, appellant contends

the evidence was (1) legally and (2) factually insufficient to support the jury's rejection of his

affirmative defense of duress; (3) the evidence was legally insufficient to support the jury's

rejection of his justification defense of necessity; (4) the trial court improperly instructed the jury

on the law of parties; (5) the trial court erred in admitting video evidence; the trial court erred in

excluding from the guilt–innocence phase testimony from (6) Dr. Lisa Clayton, (7) Dr. Michael

Pittman, and (8) Detective Michael Yeric; (9) the trial court erred in denying appellant's pretrial

motion to suppress; and (10) the sentence was disproportionate to appellant's conduct during the

offense and punishments received by other bystanders. The State also brings a cross-point seeking

modification of the judgment.

Based on the evidence the jury heard during the guilt–innocence phase of the trial, we conclude there is legally sufficient evidence supporting the jury's rejection of appellant's affirmative defense of duress and justification defense of necessity. However, we conclude the trial court erred in categorically excluding from the guilt–innocence phase appellant's proffered testimony from Detective Yeric and expert witnesses Dr. Pittman and Dr. Clayton, and we conclude appellant was harmed by this error. Accordingly, we reverse and remand.

**BACKGROUND AND PROCEDURAL HISTORY**

**I. Guilt–Innocence**

On the evening of July 1, 2016, Dallas Police Officer Jacob Deloof and other officers responded to a 911 call regarding a possible dead body in the backyard of a home located at 755 Elwayne Avenue. At first the officers did not see anything, but then they heard noise coming from a "finished, garage-type . . . structure" that was located on the property. They received additional information about an armed suspect inside the structure, and officers surrounded it, set up a perimeter, and took cover. A man, Martin Armijo, exited the structure and fled on foot. While multiple officers chased Armijo, Officer Deloof entered the structure. He and other officers found an injured woman, Avigail Villanueva, holding a shirt to her head. There was a large laceration on her scalp and there appeared to be blood on her face and blood running down her arms. Deloof testified that she was "hysterical," "physically shaking," and "she was extremely scared." He added that "[s]he was just extremely worried about her own safety and getting away from the situation." Officers took her outside, and medical professionals from Dallas Fire and Rescue cared for her. She was taken to the hospital for medical treatment.

Officer Kristen Greene was one of the officers who pursued Armijo. She jumped a fence to get to Jonelle Avenue, the street that was to the west of Elwayne, eventually seeing Armijo. He insisted he had done nothing wrong and claimed the real suspect, someone armed with a shotgun,

had fled across the street. She held Armijo at gunpoint and waited for backup to arrive. He continued to insist the suspect had fled across the street and gone in a westbound direction.

Officers handcuffed Armijo and put him in a squad car. Officer Greene and her partner then returned to the garage-type structure and went inside, finding the dead body of complainant Jonathan Gutierrez. Officers secured the scene and called the medical examiner's office, the homicide division, and the crime scene division.[1]

Justin O'Donnell, a crime scene analyst with the Dallas Police Department, and his supervisor, Maurice Thomas, photographed the crime scene and collected evidence. O'Donnell photographed the exterior of the property and the inside of the structure, observing and photographing what appeared to be blood on a computer tower, the floor, and the wall. O'Donnell also photographed Gutierrez's body. He had injuries on his arms and head, and his hands were bound with duct tape. O'Donnell observed and photographed a bottle of bleach, which he did not collect but swabbed for possible DNA evidence. He photographed an assault rifle found inside the structure near Gutierrez's body. He also collected two handguns, an "Essex Arms .45 auto" and a "Kimber .45 caliber semiautomatic handgun," and gun magazines.

Outside the structure, O'Donnell photographed two articles of clothing, a pair of shorts and a black shirt. He observed, photographed, and collected a baseball bat found at the crime scene. A folding knife was found under a bed and also collected as evidence. Thomas likewise processed trash bags found outside the structure.

Growing up in the Pleasant Grove area of Dallas, Texas, Villanueva met Jonathan Gutierrez when she was thirteen years old. They dated for a couple of years and broke up, but they got back together when Villanueva turned eighteen years of age. They had five children together. They

---

[1] Officers Deloof and Greene wore body cameras that recorded their participation in the investigation, and that video footage was admitted into evidence.

lost custody of their children in 2014 because of their drug addictions, and the four oldest were placed in the custody of Villanueva's mother while Gutierrez's mother took custody of the youngest child. Villanueva and Gutierrez ended their relationship in 2015.

Villanueva, like Gutierrez, was a methamphetamine and heroin user, and Villanueva regularly bought and used drugs at the garage-type structure of Thomas Johnson (also known as "T"), which was located behind his parents' home at 755 Elwayne Avenue in Dallas, Texas. Villanueva met Martin Armijo there, and they dated for five or six months. When they broke up, Armijo told Villanueva he did not want to have anything to do with her and to stop texting and calling him. Villanueva testified that Armijo had a reputation in the community for being violent, and he encouraged that reputation.

On July 1, 2016, Villanueva wanted to get some heroin and methamphetamine. She planned to go to Johnson's neighborhood to look for it because that was the only place where she knew she could find it. But before going, she contacted Armijo because he had previously told her that if he ever saw her in the neighborhood without him, he would beat her. Fearing she would "bump into" Armijo, she texted him "to see where he was." He responded, "I got your BD [baby daddy] with me." Armijo then called her and the first thing Villanueva said to him was, "[W]hat are you talking about?" He answered, "I got Jonathan with me." Villanueva recalled that "nothing bad at all" "popped into my head" at first; she merely thought the two men had become friends. But then Armijo said, "I been having him for the past couple hours." Not sure what that meant, Villanueva asked: "[W]hat do you mean for the past couple hours? What do you mean you been having him?" And Armijo said, "Yeah, I got him right here." Villanueva told Armijo she still did not know what he was talking about, and he explained that he had been torturing Gutierrez, also known as "Spook," "for the past couple hours." Villanueva testified that she was so shocked she could not say anything. Armijo then asked her where she was, and Villanueva lied. She said she

was at her mother's house because she "was scared of what he was going to think or do if he found out where I was—where I really was."

Villanueva immediately called her mother, who was at the bank, to find out where she was, and Armijo called on the other line and told her to "come outside." This led Villanueva to believe Armijo was at her mother's house in Mesquite, Texas, so she lied again, telling him she was with her mother. Armijo answered, "Well, I'm outside," and he said that he could "do federal time for what I'm doing." Armijo again asked her where she was, and Villanueva said she was with her mother, that she would call him when they were finished, and that her mother would take her to him.

Villanueva recalled that, probably thirty to forty-five minutes later, she called Armijo and told him her mother would not take her to Johnson's apartment, but she would drive her to a nearby gas station. At that point, Villanueva was about two blocks from that gas station, and she could hear Armijo on the phone telling appellant Ricky Moreno to grab the keys and go pick her up at the gas station. Appellant arrived alone at the gas station a few minutes later.

Villanueva testified that she had known appellant for "[a] few years," and she frequently saw him at Johnson's house or in the neighborhood. After appellant picked her up at the gas station, she asked him what was going on, and he said Armijo "had been having Jonathan since that night before." Villanueva told him that Armijo had said he "only had him for a few hours," and it looked like appellant "kind of got scared that I told him that." She said that appellant "told me not to tell Martin what he told me." She went inside the gas station to get something to drink, and after she got back in the car, she asked appellant, "How bad was it? Was it something serious?" He "kind of told me, he was like, 'Yeah, yeah.'" They drove to another gas station where appellant cashed some lottery tickets because he wanted to buy cigarettes, after which they drove to 755 Elwayne Avenue. Asked to describe appellant's demeanor, Villanueva thought "[h]e looked kind

of nervous." She also recalled that he "kept smoking cigarettes on the way over" and "really didn't say much."

When they pulled up in front of the house, appellant told Villanueva to go and knock on the door of the "back shack" where Johnson lived. Villanueva knocked, and she could hear Armijo saying, "She's here. She's finally here," before he opened the door. Villanueva went inside and saw Gutierrez sitting on the floor in a corner of the room, leaning against a wall. He was not talking. "He was just laying there, like he was in pain." The "whole room was a wreck," and Armijo was holding a baseball bat. In addition to Armijo and Gutierrez, three other individuals, appellant, Johnson, and David Rodriguez, also known as "GG," were present. When Villanueva first arrived, she saw Johnson standing on the other side of the room. Rodriguez was putting stuff into trash bags. Asked if she saw any drugs being used, Villanueva testified that when she got there she saw Johnson making "cheese," which was "heroin mixed with pills." Villanueva said that "[a]ll of us," including herself, were using the "cheese."

Villanueva recalled that she saw Armijo swing the bat at Gutierrez with both hands, hitting him "[a] few times." Gutierrez screamed at Armijo several times, "Stop." Armijo also poured bleach on Gutierrez, who did not say anything, just moving his head from side to side so the bleach would not hit him in the face. Armijo then threw an open pocket knife at Gutierrez, and threw it again and again, stabbing him "a few times." Gutierrez was still moving at this point but not saying anything. Armijo briefly turned his attention back to Villanueva, who insisted she had been with her mother. Armijo said she was lying. He then turned back towards Gutierrez, who was no longer moving. Armijo tried, unsuccessfully, to wake him up. Asked why Gutierrez had stopped screaming and was no longer moving, Villanueva replied, "Because he was dead."

Villanueva testified that she "couldn't believe it" when she realized Gutierrez was dead. Appellant, meanwhile, went in and out of the garage while Armijo was attacking Gutierrez.

–6–

Villanueva did not see Armijo hit appellant or David Rodriguez. After Gutierrez died, Armijo told appellant to look for something to wrap up Gutierrez's body, and he told Rodriguez to "start cleaning." Rodriguez started "putting stuff" into garbage bags and taking them outside. Armijo told appellant to stay outside, adding that he should "watch out" and "make sure nobody . . . went back there." With appellant out of the garage, Armijo turned his attention to Villanueva, and she believed Armijo wanted to "[k]ill me too." Armijo struck Villanueva repeatedly with a .45-caliber handgun, leaving bruising and other injuries on her head, arms, hands, and legs.

After appellant left the garage, he picked up his mother and a man named "Eric," who was Johnson's brother, and drove them to the nearby house of appellant's brother, Alex Moreno. Appellant lived with his mother in their family home on Ezekial Avenue, about two blocks from the offense location. Moreno lived on Gillette, which he testified was about a five-minute drive from the Ezekial address. Moreno testified that he got home from work at "a little bit after 4:00 o'clock" on July 1, 2016, and watched the news. His wife left to get something to eat for the family, and Moreno took a shower. When he got out of the shower, he saw his mother and brother "just standing in my hallway." Moreno was not expecting them, and he recalled that "it was kind of odd to see both of them at my house."

Moreno testified that appellant "looked frightened," and he was "standing there with some big eyes. He look[ed] scared." Moreno asked his mother what they were doing, and she "snapped" at appellant, prodding him with her elbow and saying, "Tell him. Tell him." As Moreno recalled, this appeared to have the effect of "snap[ping] [appellant] out of it." Appellant said a murder had occurred, and that "Martin just killed Spook." Moreno asked if appellant had seen it, and appellant replied, "Man, Martin is there." This led Moreno to think the police "had already got there and everything." He asked, "[W]hat did the cops do? Did they take him to jail?" Appellant said the body was "still there," as was Armijo, and that "I just got away from them." Appellant also said

the police had not yet been called, to which Moreno replied, "We need to call the police," and he called 911. He gave the phone to appellant during the 911 call (admitted into evidence) to answer the dispatcher's questions. Moreno told the dispatcher appellant had been held at gunpoint, and appellant provided details regarding the location and the suspect's name. On cross-examination, Moreno acknowledged that appellant did not tell him or the 911 operator that anyone else was in danger at the offense location. Police officers soon arrived at Moreno's house and asked appellant to accompany them to the crime scene.

Detective Casey Shelton of the Dallas Police Department was the lead detective on the case. He arrived at the crime scene and talked to the patrol officers, getting a brief summary of what happened. Shelton explained that 755 Elwayne was a small house that included a driveway to the right of the property and what was originally a garage in the rear of the property. This structure appeared to have been converted into two rooms for living purposes, and it was there that Gutierrez's body was found. He said the interior of this garage-type structure was "in disarray" and that "[i]t was a mess," with "just stuff everywhere." He recalled that there were garbage bags found outside this two-room structure that contained pillow cases, sheets, and towels, some of which appeared to have blood stains. He also saw towels and other linens inside the structure, and some of these likewise appeared to have blood stains.

After visiting the crime scene Shelton went to the hospital to speak to Villanueva while his partner interviewed appellant. Shelton testified that Villanueva appeared to have been beaten. She provided an account of the actions of Armijo (who she identified by name), Rodriguez (who she referred to by his nickname, "GG"), and appellant. Shelton testified that his investigation revealed, initially, that appellant was present for the majority of the offense against Gutierrez, and that, at one point, he picked up Villaneuva from one location and brought her to the offense location on Elwayne. It further showed, according to Shelton, that appellant assisted in abducting and

–8–

restraining Gutierrez, and that he assisted in cleaning up the crime scene by purchasing bleach and towels.

As part of his investigation, Detective Shelton interviewed Johnson and Rodriguez, and he obtained Armijo's cell phone records. The cell phone records included text messages sent on the afternoon of July 1, 2016, from Armijo's phone to a phone number officers believed was associated with Villanueva. Among the text messages was one sent at 1:50 p.m., in which Armijo texted, "Call me asap." At 1:51 p.m. he texted, "I need to talk important." At 1:54 p.m. he texted, "U have ur nd I got him here with." Shelton noted that "nd" was a reference to Gutierrez, and that Armijo was holding him. Thirty-nine seconds later Armijo texted, "Call me." At 2:04 p.m. he texted, "R u coming?" At 2:12 p.m. he texted, "I've been flicking ur bd for like 2 hours," and Shelton testified that "bd" again referred to Gutierrez, who Armijo had apparently been holding for at least two hours. At 2:14 p.m. he texted, "I fucked hm up d homies holding for me," which led Detective Shelton to conclude Armijo's friends had been holding Gutierrez. At 2:28 p.m. Armijo texted, "I'm gonna hold him for 2," and thirteen seconds later he texted, "Get over here."

Armijo also recorded a two-minute and thirty-three second cell phone video that briefly shows appellant in the background. In this video, which was admitted into evidence and played for the jury, Armijo and Gutierrez are in the garage at 755 Elwayne. Armijo is holding a pistol and pointing it at Gutierrez, repeatedly taunting and threatening him. Gutierrez—bound, bleeding and apparently severely beaten—begs for his life and expresses his desire to leave the residence. Toward the end of the video, appellant can be seen entering the room while Armijo is talking into the camera. Appellant is walking around the bed and holding what appears to be a bottle of bleach in a plastic grocery store sack. He places the bleach and what look like towels on the bed. Shelton testified that appellant got the bleach and towels to clean up the blood inside the garage, and that, based on the detective's review of the video, appellant did not appear to be afraid.

Homicide Detective Pedro Trujillano interviewed appellant at Dallas Police Headquarters on July 1, 2016. When Trujillano first entered the interview room appellant asked, "Where is my buddy, Mr. Yerik?" Yerik had been a homicide detective with the Dallas Police Department, and appellant explained that he had become acquainted with him when "[m]y dad was killed in 2012." During the recorded interview, which was admitted into evidence, Detective Trujillano observed stains on the upper part of appellant's white t-shirt—towards the neckline—that he thought might have been blood, but he did not see any cuts on appellant's body near that area. Appellant did not make any statements about injuries he suffered or pain. Trujillano testified that at times during the interview appellant "seemed scared," but that "[s]ometimes he talked and smiled and laughed a little bit." Trujillano added, "It's not uncommon."

Appellant told the detective that he arrived at the garage-type structure on 755 Elwayne at between 12:30 and 1:00 o'clock, and that Gutierrez, or "Spook" as he sometimes called him, arrived at around 2 o'clock. Appellant said that he and Gutierrez were friends and that he had no "beef" with him. Appellant explained that he knew Armijo was dating Villanueva, Gutierrez's "baby mama," and that Armijo had always been known to carry a pistol. Appellant said they were "chilling out" when Armijo pulled out his gun, took out the clip, and walked over to Gutierrez. Armijo struck Gutierrez with the gun, saying, "Bitch, this is for Avi," and he continued to hit him. Appellant told the detective that Armijo started "beating the shit" out of Gutierrez. Appellant and Johnson (who was also present) said, "Chill out Dude," and Armijo pointed the gun at them, telling them not to get involved.

Appellant told Armijo that he was going outside. He helped Johnson's little brother, Eric, with his car, and then appellant drove Eric to the train station because Eric had to go to work. Appellant drove Eric's car to an auto repair shop, where he stayed for about forty-five minutes to an hour. Appellant went to a "smoke shop" next door to buy a pack of cigarettes, and he bought

–10–

some fireworks. When he returned to the garage, Johnson was in his room inside the "main house."

Appellant knocked on the door to the garage, went inside, and saw "blood everywhere." Gutierrez appeared to be dead. Armijo kicked Gutierrez, saying, "The fucker made me kill him." Armijo pointed an "AR" rifle (which appellant described as, "Like an M16") at appellant, which made him think Armijo was "going to shoot me." Appellant told Armijo, "Hey bro, chill out, man." Armijo said to appellant, "You ain't gonna say nothin, right?" Appellant said he was "just scared" when he saw the "red dot" from the rifle's sight pointed at him, adding that he had been shot before "and it was no fun." Appellant became emotional and started crying as he talked about what happened to Gutierrez and how badly he had been beaten, saying he "didn't deserve that."

Appellant told the detective that he got out of the garage by telling Armijo he was going outside to "keep a lookout," and that he grabbed a rake and briefly pretended to work because he suspected Armijo could see him through a video surveillance camera.[2] Several minutes later, Eric pulled up to the house with his girlfriend. Appellant said that Eric could tell from the way appellant was looking at him that something was wrong. Eric grabbed his bag and started walking toward the garage, and appellant told him they should "just go" because appellant had "killed Spook." Eric drove appellant to his house, which was two blocks away. Appellant got his mother and went to his brother's house, where the police were called.

Regarding Villanueva, appellant said that she was already at the garage when he returned after driving Eric's car to the auto repair shop, and she did not say anything. He told the detective she "just showed up." Appellant said he had known Armijo for about ten years, and they had all

_____

[2] Villanueva testified that there was a video surveillance system at the Elwayne property. The camera was mounted on the corner of the garage, so that somebody on the inside could look at a video monitor or television screen and see people coming down the driveway towards the garage. She also testified that this surveillance system had been in place for a long time—as long as she had been going to T's—and it was working on the day of the offense. One of the photos taken by crime scene analyst Justin O'Donnell showed a cable above the door to the garage that looked like it is going to a "mount of some sort," and it was possible this mount could have been for a surveillance camera. But he added that he did not recall seeing a surveillance camera mounted on the garage, and he could not say whether someone on the inside of the garage could see people coming and going.

–11–

grown up in the same neighborhood. He described Armijo as the type of individual "I would try to avoid." Toward the end of the interview, at around 10:00 p.m., appellant identified Armijo in a photographic lineup as the person he had seen beating Gutierrez, and appellant cried when the police showed him Armijo's picture in the lineup.[3] Trujillano testified that appellant was a witness to the offense at this point and not under arrest, and he freely left the police headquarters after the interview.

Detective Shelton conducted a second interview of appellant at appellant's home on July 6, 2016, but this second interview, also recorded and admitted into evidence, differed in some ways from the first. Appellant admitted leaving the garage and returning twice, first to buy cleaning supplies and then to retrieve Villanueva—both times at Armijo's direction. He admitted holding down Gutierrez's legs—again, at Armijo's direction—while Armijo taped his hands together, and appellant admitted leaving the garage to buy bleach and towels to clean up the crime scene. Appellant also admitted picking up Villanueva and bringing her to the garage after initially denying he had done so. As before, appellant said that he feared Armijo. Shelton interviewed Villanueva again after appellant's second interview, and Shelton testified that her second interview was consistent with the first.

Detective Shelton obtained arrest warrants relating to Gutierrez's death for Armijo, appellant, Rodriguez, and Johnson. He did not seek an arrest warrant for Villanueva because he had no information indicating she took an active part in the offense. He concluded that appellant assisted Armijo in the aggravated kidnapping of Gutierrez "[b]ased on—on his statements that he assisted in the restraining, the abduction of—of Mr. Jonathan Gutierrez by holding him down while his hands were bound, preventing him from—from fleeing." Shelton testified that it did not appear appellant acted under duress. He explained that, because appellant was able to leave the offense

---

[3] This portion of the interview was introduced into evidence by the defense.

location several times, he did not appear to have been under the immediate threat of bodily harm or death. Once the arrest warrant was issued, appellant turned himself in to the police.

The State also offered evidence regarding forensic DNA testing. Courtney Ferreira, a DNA analyst at the Southwestern Institute of Forensic Sciences (SWIFS), testified that she performed DNA testing on several items of evidence. She testified that no DNA profile was obtained from a stain on a pair of scissors or from one stain on a pink towel. Stains on pieces of duct tape and a stain from a coaxial cable contained single-source contributions that matched Gutierrez's DNA profile and excluded appellant and Armijo. Another stain from a coaxial cable contained a mixture of DNA, which included Gutierrez and appellant as possible contributors but excluded Armijo. One stain from the same coaxial cable contained a mixture of DNA from four contributors and included Gutierrez, appellant, and Armijo as possible contributors. A sample from a pair of scissors consisted of a profile from a single contributor that matched Gutierrez's DNA profile and excluded appellant and Armijo. A low-level sample from a pink towel contained DNA from a single contributor and included appellant and Gutierrez as possible contributors. A stain from a green towel contained DNA from a single individual; Gutierrez was included as a possible contributor while appellant and Armijo were excluded. Another stain from a green towel contained a mixture of two contributors, and appellant, Armijo, and Gutierrez were all possible contributors. Regarding the bleach that was used to clean up the crime scene, Ferreira was asked how strong bleach was, and she acknowledged that bleach had been "shown to take away or clean up DNA or anything like that."

Appellant presented the testimony of Duane Westerlund, a sergeant with the Dallas Police Department, who was dispatched to Gillette Street in Dallas, Texas, on July 1, 2016. Police had received a 911 call regarding a person who said he observed a murder at a different location. Sergeant Westerlund spoke to this person—appellant—who told the sergeant he had been "in a

–13–

back apartment" of a house on Elwayne Avenue and that he witnessed a murder there. Appellant also said he knew the victim and the offender, both of whom he identified by name. Appellant "was visibly shaken up," emotionally upset, and frightened when he spoke to Sergeant Westerlund, telling the officer he had been threatened and that Armijo pointed a gun at him. Appellant told the officer he tried to get away from the suspect to call 911. Westerlund testified on cross-examination that appellant had said the torture lasted "an extended period of time." Appellant, however, did not tell the officer he had left the garage to buy cleaning supplies and then returned to the crime scene; that it was appellant's intention to help clean up the blood at the crime scene; that he held the victim's legs while his hands were bound; or that the purpose of the kidnapping was to lure Villanueva to the garage so she could see Gutierrez "in this condition."

Appellant was indicted for aggravated kidnapping. The trial court charged the jury on the law of parties, the affirmative defense of duress, and the defense of necessity. During their closing arguments, both parties focused on the extent to which appellant's actions such as coming and going from the offense location, buying bleach, towels, cleaning supplies, and so on, made him a party to the aggravated kidnapping. The defense argued appellant did all of these things, and, also, that he held down Gutierrez's legs, because Armijo pointed a gun at appellant and appellant feared Armijo was going to kill him or harm his family—not, in other words, because appellant willingly aided in the commission of the offense.

The State focused on appellant's dishonesty and called jurors' attention to the lies appellant told during his recorded statements to the police. The State argued that appellant offered willing assistance to Armijo and "knew what was going on," and "knew exactly what he was a part of." The State also noted that some people—Thomas Johnson and David Rodriguez for example—freely left the garage at various times during the offense, and appellant left twice. The State asked why a "madman" supposedly feared throughout the neighborhood would let so many people leave.

–14–

The State pointed out that the only person who said Armijo pointed a gun at appellant was appellant himself, and this was a self-serving statement. Toward the end of its argument, the State played the cell phone video that showed appellant moving in the background as Armijo spoke into the camera and argued, "There is no duress to that."

The jury ultimately found appellant guilty of aggravated kidnapping as charged in the indictment. Before the start of the punishment phase, appellant entered a plea of not true to the enhancement paragraph alleging a prior felony conviction for aggravated assault.

## II. Punishment

The State presented the punishment testimony of Dr. Tracy Dyer, the medical examiner with the Dallas County Medical Examiner's Office who performed the autopsy on Gutierrez. She testified that Gutierrez's body "had a lot of blunt trauma, and he had some sharp-force injuries as well. And then basically every different area of his body had some of each of these." He had stab wounds to the lower lobe of his left lung and his liver. These wounds had been caused by a sharp instrument, "probably a knife of some type." Both of Gutierrez's arms were fractured. "There were abrasions, scrapes, and marks on the tops of both shoulders," and abrasions on the back. Both of Gutierrez's hands "were very swollen," as though they "had been struck or struck against something." Toxicology tests showed the presence of methamphetamine and some amphetamine (probably a metabolite of the methamphetamine) in Gutierrez's blood. Dr. Dyer testified that "[t]he cause of death was blunt and sharp-force injuries."

The State also called Dallas Police Officer John Puente, with the department's gang unit, who transported appellant to the county jail after he turned himself in on the arrest warrant. Officer Puente testified that appellant spoke of his gang affiliation, saying that he was a member of Tango Blast, a prison gang. The officer observed a star tattoo with a "214" on it, which correlated with gang membership. Detective Shelton testified that during appellant's second interview, appellant

–15–

told him he had left the scene because he believed Armijo would kill him for witnessing Gutierrez's murder. Gutierrez's father, Mario Ovalle, testified about the effect Gutierrez's death had on the family.

Darrell Doty, an investigator with the Dallas County District Attorney's Office, testified that he fingerprinted appellant and compared the prints with those in State's exhibits 114 through 118, which were certified prior convictions. The exhibits showed prior convictions for aggravated assault with a deadly weapon (State's exhibit 114); unlawful possession of a controlled substance, heroin (State's exhibit 115); unlawful possession of a controlled substance, cocaine (State's exhibit 116); "[e]vading arrest detention facility using vehicle" (State's exhibit 117); and unlawful possession of a controlled substance, cocaine (State's exhibit 118). Doty positively identified appellant's fingerprints as those associated with State's exhibits 114, 115, 116, and 117, and he explained that State's exhibit 118 was styled the *State of Texas versus Ricky Moreno* (out of the 282nd Judicial District Court of Dallas County) but it did not include a fingerprint card.

Appellant presented evidence regarding his father's murder in 2012 during a home invasion and the effect it had on him. Dr. Lisa Clayton, "a medical doctor specializing in the field of psychiatry with a subspecialty in forensic psychiatry," testified about her evaluation of appellant and her conclusions. She said that based on her evaluation of appellant and the information she had reviewed—including police reports, witness statements, video recorded by Armijo on his phone, appellant's school records, and hospital and jail records—appellant suffered from post-traumatic stress disorder (PTSD) stemming from the 2012 home invasion during which his father was murdered. Dr. Clayton explained that appellant's father had died in his arms, and after that appellant exhibited symptoms of PTSD and had a variety of "intrusive thoughts" and nightmares; often cried; did not like to associate with family because they reminded him of his father; "increased his drug usage"; and was unable to sleep. She testified that she did not think appellant

was "malingering" (i.e., "faking or exaggerating symptoms for secondary gain") the symptoms of PTSD, noting he had an IQ of between 75 and 85, was "not very bright," and he was not "smart enough to know the symptoms and then repeat them back to me." She added that the way in which appellant described his symptoms and his physical reaction further convinced her appellant was not "faking symptoms of PTSD." She opined that because appellant had PTSD, he would have seen himself as a victim and been more fearful in a situation involving guns and violence. He also had "an over-exaggerated sense of worry about his mother and something happening to her." Regarding how appellant's psychiatric condition affected his behavior on July 1, 2016, Dr. Clayton said that appellant's condition "made him more fearful and less—I guess less—that he didn't act appropriately in that situation." When Armijo threatened appellant's family, appellant "believed that that could actually happen, and that caused him to not go get help sooner." On cross-examination, Dr. Clayton testified that she did not prepare a report of her findings, explaining that she was not asked to prepare one. She also explained that she did not perform any standardized testing in her evaluation of appellant, saying that practice did not really exist in forensic psychiatry.

Detective Michael Yeric testified that he was the lead detective in the 2012 case involving the murder of appellant's father, Lorenzo Moreno. Yeric testified as follows:

> In that case, there was a man in his 60s that was killed inside of his home during a home invasion robbery. There was a group of young people—in some cases were very young—between the ages of 13 and 17 that did a home invasion on the house. There was a girl involved in the home invasion that had an issue with the girl that lived at the house. That was the—the reason for the—the home invasion.
>
> They go in the house. During the incident, there's—there's a lot of, you know, confrontation and fighting and whatnot, during which the—the man—the 66-year-old man—was shot in the chest with a shotgun and killed.
>
> The 16-year-old girl in the back was—attempted to be stabbed, but the knife was dull enough that it didn't actually really get in the bed sheets and the comforter. It poked her, but no serious wounds.
>
> The man that was killed, his wife was—was beaten inside the house and his son was beaten on the front porch.

The offense occurred just after midnight, and Detective Yeric believed the members of the Moreno family were innocent victims. Yeric identified appellant as the son who was beaten on the porch, and the girl who lived at the house was appellant's niece, Olivia Hernandez. Five people were charged in the offense. Yeric believed a total of seven people were probably involved, but the police were never able to positively identify the other two suspects. Appellant offered—and the trial court admitted—photographs of the crime scene that depicted damage to appellant's home, blood from where appellant's father was shot, and blood spatter on a Ford pickup in the driveway of the home. The defense also presented photographs of appellant in the hospital following the attack that showed appellant's facial injuries—contusions around the face, facial injuries, and blood. On cross-examination, Detective Yeric testified that what happened in 2012 was undoubtedly a traumatic event but he did not think being a crime victim excused later criminal conduct.

Olivia Hernandez testified that, prior to appellant's arrest in this case, appellant cared for his mother, who suffered from various health problems. Hernandez testified about the 2012 home invasion, recalling that it occurred at close to midnight and that the entire family—Hernandez, her grandmother, her grandfather, and appellant—was in the home. She said she was injured during the attack, suffering three gashes to her head and small cuts on her stomach. She said she had never seen appellant behave violently toward anyone or even hurt an animal, and she described him as a loving member of the family—adding that all of appellant's family loved and cared about him. On cross-examination, she said she was unaware appellant had prior felony convictions but knew he had been in prison because she had visited him there with her grandparents. She testified she had never heard appellant claim membership in the Tango Blast gang. She said she and her family were aware appellant had a drug addiction, and that it "became really worse" after the 2012 home invasion. Appellant blamed himself for what happened to his father and "felt like he could

–18–

have fought harder."

The jury found the enhancement paragraph true and assessed punishment at forty-five years' confinement and a $10,000 fine.

DISCUSSION

I. Duress

In his first issue, appellant contends the evidence is legally insufficient to support the jury's rejection of the affirmative defense of duress.[4]

Unlike criminal convictions that are subject only to legal sufficiency review, we may review a finding rejecting an affirmative defense for both legal and factual sufficiency. *Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015); *Matlock v. State*, 392 S.W.3d 662, 668–70 (Tex. Crim. App. 2013). When a defendant challenges the legal sufficiency of the evidence supporting the jury's rejection of an affirmative defense, we examine the record for any evidence that supports the jury's negative finding while ignoring all evidence to the contrary, unless a reasonable jury could not. *See Matlock*, 392 S.W.3d at 669. If no evidence supports the jury's negative finding, we examine the entire record to determine whether the evidence establishes the issue as a matter of law. *Id*. A jury's finding on a defendant's affirmative defense should be overturned for lack of legally sufficient evidence only if the evidence conclusively proves the affirmative defense and no reasonable jury was free to think otherwise. *Id*. at 670.

To establish the affirmative defense of duress, a defendant must prove by a preponderance of the evidence that he committed the offense because he was compelled to do so by threat of

---

[4] We address appellant's legal sufficiency issues because, in the event they are meritorious, we would render a judgment of acquittal rather than reverse and remand. *See, e.g., Benavidez v. State*, 323 S.W.3d 179, 181 (Tex. Crim. App. 2010) (appellate courts render judgment of acquittal only when trial court's ruling amounts to de facto acquittal or appellate court finds evidence was legally insufficient to support conviction); *O'Reilly v. State*, 501 S.W.3d 722, 727 (Tex. App.—Dallas 2016, no pet.) (legal sufficiency challenge must be addressed first because if evidence is insufficient, reviewing court must render judgment of acquittal). *But see Matlock v. State*, 392 S.W.3d 662, 672 (Tex. Crim. App. 2013) (if appellate court conducting factual sufficiency review finds the evidence supporting an affirmative defense so greatly outweighed State's contrary evidence that verdict was manifestly unjust, the court reverses the trial court's judgment and remands case for new trial).

–19–

imminent death or serious bodily injury to himself or another. TEX. PENAL CODE ANN. § 8.05(a). Compulsion "exists only if the force or threat of force would render a person of reasonable firmness incapable of resisting the pressure." *Id*. § 8.05(c); *see also Edwards v. State*, 106 S.W.3d 833, 843 (Tex. App.—Dallas 2003, pet. ref'd). "'Imminent' means something that is immediate, something that is going to happen now." *Murkledove v. State*, 437 S.W.3d 17, 25 (Tex. App.—Fort Worth 2014, pet. dism'd, untimely filed) (citing *Dewalt v. State*, 307 S.W.3d 437, 454 (Tex. App.—Austin 2010, pet. ref'd)). "Harm is imminent when there is an emergency situation and it is 'immediately necessary' to avoid that harm, in other words, when a 'split-second decision' is required without time to consider the law." *Id*. (quoting *Pennington v. State*, 54 S.W.3d 852, 857 (Tex. App.—Fort Worth 2001, pet. ref'd)). Imminence "has two components: (1) the person making the threat must intend and be prepared to carry out the threat immediately, and (2) the threat must be predicated on the threatened person's failure to commit the charged offense immediately." *Cormier v. State*, 540 S.W.3d 185, 190 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (citing *Devine v. State*, 786 S.W.2d 268, 270–71 (Tex. Crim. App. 1989), and *Anguish v. State*, 991 S.W.2d 883, 886 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd)); *see also Ramirez v. State*, 336 S.W.3d 846, 851 (Tex. App.—Amarillo 2011, pet. ref'd).

Imminent harm must be shown by affirmative evidence. *Darty v. State*, 994 S.W.2d 215, 218–19 (Tex. App.—San Antonio 1999, pet. ref'd). A threat of harm at some indefinite time in the future is insufficient to satisfy the requirement of imminence. *Ramirez*, 336 S.W.3d at 851–52; *Anguish*, 991 S.W.2d at 886. The affirmative defense of duress is not available "if the actor intentionally, knowingly, or recklessly placed himself in a situation in which it was probable that he would be subjected to compulsion." TEX. PENAL CODE ANN. § 8.05(d). Also, evidence of a generalized fear of harm is not sufficient to raise the issue of imminent harm. *Brazelton v. State*, 947 S.W.2d 644, 648 (Tex. App.—Fort Worth 1997, no pet.). If undisputed facts indicate a

complete absence of immediate necessity or imminent harm, then a defendant's sincere belief that his conduct is immediately necessary to avoid imminent harm is unreasonable as a matter of law. *Dewalt*, 307 S.W.3d at 454.

Appellant attempts to show he participated in the charged offense under duress by pointing to evidence Armijo threatened him and pointed a gun at him. The record shows Armijo had two handguns and an assault rifle in the garage where he tortured and killed Gutierrez. In addition, the jury heard Villanueva testify that appellant seemed nervous when he picked her up at a gas station and drove her to the garage. Appellant's brother, Alex Moreno, testified that appellant looked scared when he arrived at his house on July 1, 2016. Detective Trujillano testified that appellant became emotional during the July 1, 2016 interview, and both Trujillano and Detective Shelton acknowledged that appellant repeatedly said he was frightened during the incident. Appellant told detectives that Armijo pointed a gun at him.

But the only evidence that Armijo threatened appellant with a gun came from appellant's account of the incident, which the jury was free to reject. Moreover, appellant's claim of duress is inconsistent with evidence showing he twice left the garage alone and returned while Armijo remained there and continued beating and torturing Gutierrez. The jury could have also taken into account facts such as Armijo's cell phone video apparently showing appellant entering the room and walking around the bed while Armijo was talking into the camera, and appellant's apparent hesitation in reporting the incident—first picking up his mother and then going to his brother's house, where his brother insisted they call 911. Based on the evidence, the jury could have rationally concluded appellant was not faced with an imminent threat to himself or his mother. *See, e.g., Murkledove*, 437 S.W.3d at 25; *Dewalt*, 307 S.W.3d at 454.

Although there was evidence appellant feared Armijo, that he told detectives Armijo pointed a gun at him, and that he was afraid Armijo would harm himself or his family may

circumstantially support a finding of duress, it does not conclusively establish such a finding—particularly given the evidence showing appellant repeatedly going to and from the offense location. Because some evidence exists to support the jury's implied negative finding on duress, the record satisfies the first part of the legal sufficiency standard, and we need not consider the second part of the analysis. The evidence is, thus, legally sufficient to support the jury's negative finding on duress. We overrule appellant's first issue.

## II. Necessity

In his third issue, appellant argues the evidence was legally insufficient to support the jury's rejection of appellant's justification defense of necessity.[5]

When reviewing the sufficiency of the evidence, an appellate court considers all of the evidence in the light most favorable to the verdict to determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *State v. Bolles*, 541 S.W.3d 128, 133–34 (Tex. Crim. App. 2017); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.). An appellate court is required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *See Jackson*, 443 U.S. at 319, 326; *Bohannan v. State*, 546 S.W.3d 166, 178 (Tex. Crim. App. 2017); *Brooks*, 323 S.W.3d at 899.

"Necessity is a statutory defense that exonerates a person's otherwise illegal conduct." *Stefanoff v. State*, 78 S.W.3d 496, 500 (Tex. App.—Austin 2002, pet. ref'd). Conduct is justified by necessity if:

> (1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;

---

[5] Because necessity is a defense rather than an affirmative defense, *see Bowen v. State*, 162 S.W.3d 226, 229 (Tex. Crim. App. 2005), the *Jackson v. Virginia* legal sufficiency standard applies. *See, e.g., Strauser v. State*, No. 04–16–00478–CR, 2017 WL 4657467, at *1 (Tex. App.—San Antonio Oct. 18, 2017, no pet.) (mem. op., not designated for publication); *Pridgen v. State*, No. 12–13–00136–CR, 2014 WL 6792583, at *1 (Tex. App.—Tyler Dec. 3, 2014, pet. ref'd) (mem. op., not designated for publication).

–22–

(2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and

(3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

TEX. PENAL CODE ANN. § 9.22; *see Stefanoff*, 78 S.W.3d at 500.

A necessity defense requires that the defendant reasonably believe his conduct is immediately necessary to avoid a greater harm. *See* TEX. PENAL CODE ANN. § 9.22; *Mays v. State*, 318 S.W.3d 368, 385 (Tex. Crim. App. 2010). A "'[r]easonable belief' means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." TEX. PENAL CODE ANN. § 1.07(42); *see Mays*, 318 S.W.3d at 385; *see also Harper v. State*, 508 S.W.3d 461, 467–68 (Tex. App.—Fort Worth 2015, pet. ref'd); *Cummings v. State*, No. 05–17–00852–CR, 2018 WL 3629105, at *5 (Tex. App.—Dallas July 31, 2018, pet. ref'd) (mem. op., not designated for publication). Whether the accused's belief is reasonable is a question of fact and should be viewed from the accused's standpoint at the time he acted. *See Fitzgerald v. State*, 782 S.W.2d 876, 885 (Tex. Crim. App. 1990). "'Imminent' means something that is impending, not pending; something that is on the point of happening, not about to happen." *Schier v. State*, 60 S.W.3d 340, 343 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd); *see also Stefanoff*, 78 S.W.3d at 501. "'Harm' means anything reasonably regarded as loss, disadvantage, or injury, including harm to another person in whose welfare the person affected is interested." TEX. PENAL CODE ANN. § 1.07(a)(25).

The defendant has the initial burden of producing evidence regarding the necessity defense. *See Stefanoff*, 78 S.W.3d at 500; *Cummings*, 2018 WL 3629105, at *5. If the defendant makes this initial showing, the burden shifts to the State to disprove the necessity defense beyond a reasonable doubt. *See Stefanoff*, 78 S.W.3d at 500; *Cummings*, 2018 WL 3629105, at *5. If the jury finds the defendant guilty, it implicitly rejected his defensive theory. *Zuliani v. State*, 97 S.W.3d 589, 594

(Tex. Crim. App. 2003).

To reinforce his argument that the evidence was legally insufficient to support the jury's rejection of his necessity defense, appellant emphasizes that on both occasions when he left the garage—to buy cleaning supplies and to retrieve Villanueva—he was ordered to do so by Armijo. In addition, when appellant held down Gutierrez's legs while Armijo taped his hands, appellant did this, too, at Armijo's direction. Appellant feared Armijo—who pointed a gun at him—and he eventually reported the incident because he was afraid Armijo would harm both appellant and his family. Also, the threats were imminent because appellant's family lived only two blocks away, and Armijo knew where they lived. Appellant argues that to the extent his conduct was illegal, it was justified because of the reasonable belief his conduct was immediately necessary to avoid imminent harm.

Even if Armijo ordered appellant to leave to get the cleaning supplies and to pick up Villanueva, the evidence heard by the jury shows appellant left the offense location—alone—twice while Armijo beat and tortured Gutierrez, and appellant returned each time. The jury could have concluded that, rather than seeking help and/or not returning to the crime scene, appellant purchased the cleaning supplies and brought them back to Armijo, leaving yet again to get Villanueva. And, as we noted before, the threats of violence against appellant were based on his account of the incident, which the jury was free to reject. The jury could have reasonably concluded appellant was not faced with imminent, impending harm to either himself or his mother. *See, e.g., Stefanoff*, 78 S.W.3d at 501 ("'Imminent' means something that is immediate, something that is going to happen now."). We conclude the evidence is legally sufficient to support the jury's rejection of appellant's necessity defense, and we overrule appellant's third issue.

### III. PTSD

In his sixth, seventh, and eighth issues, appellant contends the trial court erred in excluding

from the guilt–innocence phase of the trial testimony from Dr. Lisa Clayton, Dr. Michael Pittman, and Detective Michael Yeric showing appellant suffered from PTSD.

Appellant proffered the testimony of Dr. Pittman, Dr. Clayton, and Detective Yeric out of the presence of the jury during the guilt–innocence phase. The proffered testimony of Dr. Pittman, a medical doctor specializing in forensic psychiatry, showed that he examined appellant to determine his competency to stand trial. He found appellant competent but concluded appellant suffered from "a potentially severe mental illness," which was "most probably post-traumatic stress disorder." Dr. Pittman testified that appellant discussed in detail a prior incident that "sounded like a home invasion," and that appellant's father was shot during this incident, dying while appellant held him. Appellant had problems after that "with anxiety, depression, nightmares, that sort of thing." Pittman also found appellant's intelligence to be between borderline intellectual functioning and low average and that he "wasn't that bright," but he was not "mentally retarded at all."

Dr. Clayton, also a forensic psychiatrist, testified that she reviewed appellant's school records and background materials from the case (e.g., offense reports and witness statements) before she evaluated him, concluding he suffered from PTSD. Regarding the charged offense, she proffered that appellant's PTSD "affected his—his perception of the—the dangerousness that Mr. Armijo threatened to him, and then also to his family, specifically his mother." She said appellant had "almost a learned helplessness" and "felt kind of terrorized and in shock" when he thought that Armijo "was threatening his life." Dr. Clayton testified that she used criteria from the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders in reaching her conclusion, and that the traumatic event in appellant's life was the home invasion where he was beaten; his mother assaulted; his niece assaulted; and his father murdered. Asked how PTSD might have affected appellant's behavior more than someone who did not have it, Dr. Clayton testified that

because of his PTSD, appellant was "more physically afraid" and "essentially kind of froze" when he was with Armijo and Gutierrez, experiencing a "sense of helplessness" and seeing Armijo as "being extremely powerful." He feared Armijo was going to kill him and then kill his mother, who lived in the same neighborhood.

Appellant also made a bill of exception proffering the testimony of Detective Yeric regarding the details of the 2012 home invasion. Yeric, the lead detective in the case, testified that appellant's father, Lorenzo Moreno, was murdered during a home invasion of the family's home on North Ezekial Avenue that occurred on Sunday, May 6, 2012. The detective explained that in addition to appellant and his father, appellant's mother, Adela Moreno, and his niece were present. They were all beaten by the masked intruders. Appellant's mother and niece were beaten in front of appellant and appellant's mother was thrown up against a wall—hitting it with sufficient force to leave a hole in the wall, according to Yeric's testimony. Appellant also was severely beaten, suffering two black eyes and a gash on his head that required eight staples. Yeric testified that Lorenzo Moreno was killed in front of appellant. A total of five people were arrested following this incident, and two of them were ultimately prosecuted for murder. The person identified as the shooter was convicted and sentenced to fifty-five years in prison; the other individual pleaded guilty and received a thirty-year sentence. Detective Yeric and Dr. Clayton both testified during the punishment phase.

The State objected to the PTSD-related testimony based on hearsay, relevance, and rule 403. The trial court ultimately concluded that evidence appellant had PTSD was not admissible during the guilt–innocence phase of the trial. The trial court excluded Dr. Pittman's testimony from both phases of the trial; excluded Dr. Clayton's testimony during guilt–innocence because it was "not relevant in this part of the trial"; and excluded Detective Yeric's testimony during guilt–innocence.

A defendant has a fundamental right to present evidence of a defense as long as the evidence is relevant and not excluded by an established evidentiary rule. *Miller v. State*, 36 S.W.3d 503, 506 (Tex. Crim. App. 2001); *Hernandez v. State*, 191 S.W.3d 370, 372 (Tex. App.—Waco 2006, no pet.) (citing *Miller*). Evidence is considered relevant if it is material and probative. *Miller*, 36 S.W.3d at 507. To be material, the evidence must be shown to be addressed to the proof of a material proposition, i.e., any fact that is of consequence to the determination of the action. *Id*. (quoting 1 STEVEN GOODE ET AL., TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE § 401.1). Evidence is considered probative if it tends to make the existence of the fact more or less probable than it would be without the evidence. *Id*. Proffered evidence is relevant if it has been shown to be material to a fact in issue and if it makes that fact more probable than it would be without the evidence. *Id*. Rule 403 allows for the exclusion of otherwise relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403; *Hernandez v. State*, 390 S.W.3d 310, 323 (Tex. Crim. App. 2012). We review the trial court's decision excluding evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *Miller*, 36 S.W.3d at 507.

Appellant argues that "Dr. Clayton's testimony, in particular, along with Dr. Pittman's and Detective Yeric's testimony would have demonstrated that [a]ppellant was more susceptible to duress than an ordinary person." Appellant further argues that the force or threat of force in this case would have rendered a person of "reasonable firmness" incapable of resisting pressure. The State responds that appellant is acknowledging that the expert testimony would have focused on his subjective beliefs. Additionally, according to the State, the requirements for establishing duress do not account for appellant's "subjective susceptibility." A defendant must prove "the force or threat of force would render *a person of reasonable firmness* incapable of resisting the pressure." TEX. PENAL CODE ANN. § 8.05(c) (emphasis added); *see Edwards*, 106 S.W.3d at 843.

The inquiry, in other words, is objective, not subjective. Yet, the only court of criminal appeals authority cited by appellant or the State in support of their arguments—or that we have found—is *Cobb v. State*, No. AP–74,875, 2007 WL 274206 (Tex. Crim. App. Jan. 31, 2007) (not designated for publication), an unpublished opinion. *See* TEX. R. APP. P. 77.3. Our research has similarly failed to identify a published case from a Texas appellate court resolving this question.

In *Cobb*, the appellant argued the trial court erroneously excluded testimony from two defense expert witnesses because their testimony was relevant to his duress defense. *See Cobb*, 2007 WL 274206, at *2. The disputed expert testimony, however, did not concern PTSD, but rather testimony that the defendant suffered from cognitive weaknesses consistent with fetal alcohol syndrome, making him more suggestible to outside forces and compulsion and less able to consider other options than an average person. *See id.* at *3. The court concluded that the trial court did not abuse its discretion in excluding this testimony because the inquiry on duress is an objective inquiry based on a "person of reasonable firmness," and not a subjective one. *See id.*

In reaching its conclusion that the trial court did not abuse its discretion, *Cobb* cited a Fifth Circuit decision concerning the inadmissibility of expert testimony that the defendant suffered from battered women's syndrome. *See United States v. Willis*, 38 F.3d 170 (5th Cir. 1994). As a state court we are, of course, not bound to follow precedent from the Fifth Circuit even on matters of federal law. *See, e.g., Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993) (per curiam). We may look to Fifth Circuit opinions as persuasive authority. *See Miller*, 36 S.W.3d at 507. But a closer examination of *Willis* shows it is readily distinguishable from this case.

In *Willis*, a defendant was charged and convicted of carrying a firearm during and in relation to a drug trafficking crime. *Willis*, 38 F.3d at 173. The defendant raised the defense of duress and sought to introduce expert testimony she suffered from battered women's syndrome,

which in turn forced her to commit the alleged crimes under duress. *Id*. at 173–74. As the Fifth

Circuit noted in its opinion:

> The district court permitted Willis substantial latitude in introducing evidence to support her theory that she was actually in fear for her life when she committed the acts in question. Six witnesses, including two Dallas police officers, were called to testify about [David] Perez's violent nature and Willis' fear of him. In addition, Willis called Dr. James Harrison, a clinical psychologist, to testify as to his conclusions and evaluations regarding Willis. Harrison testified that Willis had been the victim of a pattern of abuse that had its origin in a dysfunctional family wherein both of Willis' parents were alcoholics. This led to abuse by both Willis' mother and a series of stepfathers. This pattern of abuse continued through two marriages to abusive men and escalated during the violent relationship with David Perez.

> In addition to testifying about specific acts of violence against Willis, Harrison testified about her mental state. He stated that Willis was in a great deal of emotional turmoil and showed signs of anxiety and depression. Moreover, she was constantly experiencing tension due to a strong desire to be loved and a very intense fear that she might be harmed or humiliated in a relationship. Accordingly, Dr. Harrison testified that Willis' relationships fell into a very clear sort of classical pattern of a battered woman syndrome and an abusive relationship.

> The prosecution objected to this testimony, however. The district court sustained this objection and instructed counsel that it would not hear any more testimony about the battered woman's syndrome. Even so, Dr. Harrison did go on to testify that Willis was terribly afraid of Perez and would basically do anything that he wanted so as to keep any further violence away.

*Id*. at 174. It was in this context that the Fifth Circuit held that "while evidence that a defendant

is suffering from the battered woman's syndrome provokes our sympathy, it is not relevant, for

purposes of determining criminal responsibility, to whether the defendant acted under duress." *Id*.

at 177. The *Willis* court reasoned that duress had always been a defense based on the hypothetical

objectively reasonable person, and permitting evidence of battered women's syndrome would

impermissibly render that test subjective. *Id*. at 175. Such a defense, the court concluded,

necessarily related to why this particular "unusually susceptible" defendant succumbed rather than

why the hypothetical objectively reasonable person would. *Id*. at 175–76.[6]

It is also worth noting that, more recently, most federal and state courts have reached a different conclusion on the admissibility of battered woman's syndrome evidence, finding such evidence relevant and admissible. *See United States v. Lopez*, 913 F.3d 807, 821 (9th Cir. 2019); *United States v. Nwoye*, 824 F.3d 1129, 1137–38 (D.C. Cir. 2016); *Dando v. Yukins*, 461 F.3d 791, 801 (6th Cir. 2006); *United States v. Ceballos*, 593 F. Supp. 2d 1054, 1060–63 (S.D. Iowa 2009); *United States v. Marenghi*, 893 F. Supp. 85, 91–97 (D. Me. 1995); *Commonwealth v. Asenjo*, 477 Mass. 599, 82 N.E.3d 966, 973–74 (2017); *Wonnum v. State*, 942 A.2d 569, 572–73 (Del. 2007); *State v. Williams*, 132 Wash.2d 248, 937 P.2d 1052, 1058 (1997) (en banc); *United States v. Ramirez*, 87 Fed. R. Evid. Serv. 1154, 2012 WL 733973, at *3 (D.P.R. 2012). *But see Willis*, 38 F.3d at 177; *State v. B.H.*, 183 N.J. 171, 870 A.2d 273, 285 (2005). As the D.C. Circuit stated in *Nwoye*, "Reasonableness is the touchstone of a duress defense." *Nwoye*, 824 F.3d at 1136. However, reasonableness "is not assessed in the abstract." *Id*. at 1137. "Rather, any assessment of the reasonableness of a defendant's actions must take into account the defendant's 'particular circumstances,' at least to a certain extent." *Id*.; *see also State v. Richter*, 245 Ariz 1, 424 P.3d 402, 408 (2018) (citing *Nwoye*, 824 F.3d at 1137).

In the present case, unlike in *Willis*, the trial court permitted the defense no comparable latitude in presenting evidence in support of its duress defense. Neither Dr. Pitman nor Dr. Clayton was permitted to testify to any of their conclusions or evaluations regarding appellant, nor was Detective Yeric allowed to testify to any of the facts underlying the home invasion. The jury, in

---

[6] Another case that is cited in *Cobb* is *Wood v. State*, 18 S.W.3d 642, 650 (Tex. Crim. App. 2000), where the court of criminal appeals rejected the appellant's equal protection claim that the reasonable firmness standard of section 8.05 was unconstitutional as applied to him because appellant was not, and never would be, a person of reasonable firmness. Distinguishing *Willis*, which the appellant had cited, the court stated that "[w]hile *Willis* recognized that section 8.05 establishes an objective test, the defendant there did not raise an equal protection claim, nor did the Court address any equal protection concerns." *Wood*, 18 S.W.3d at 651 n.8. *Cobb* also cited *Kessler v. State*, 850 S.W.2d 217, 221–22 (Tex. App.—Fort Worth 1993, no pet.), where the court of appeals noted that duress requires a present threat of harm, not a past or a future threat—a proposition of law that neither party in this case appears to dispute. Furthermore, no equal protection argument has been made in this case. Thus, *Wood* and *Kessler*, too, are distinguishable from the instant case.

other words, did not hear testimony identifying aspects of appellant's particular circumstances that could have aided them in assessing the reasonableness of his actions. *See Nwoye*, 824 F.3d at 1137. And knowledge of the circumstances under which an alleged crime was committed is essential to a jury's determination of whether a defendant's actions were reasonable. *See Richter*, 424 P.3d at 408.

Based on the record before us, we believe Detective Yeric's testimony regarding the violent home invasion and the expert testimony of Dr. Pittman and Dr. Clayton regarding their diagnosis that appellant suffered from PTSD could indeed have identified relevant and probative aspects of appellant's particular circumstances. On balance, therefore, we are not persuaded appellant's proffered testimony would, as the State fears, alter the duress defense's reasonable person standard. The question is still whether or not "a person of reasonable firmness" would have been incapable of resisting the pressure to engage in the proscribed conduct. *See* TEX. PENAL CODE ANN. § 8.05(c). Thus, we conclude the proffered evidence was relevant and probative and that the trial court abused its discretion in categorically excluding the testimony of Dr. Pittman, Dr. Clayton, and Detective Yeric from the guilt–innocence part of the trial. For these same reasons, we reject the State's argument that the trial court could have concluded the proffered testimony was overly confusing or misleading to the jury. *See* TEX. R. EVID. 403.[7]

Having concluded the trial court erred, we now turn to the question of harm. In general,

---

[7] This is not to suggest, of course, that *all* proffered testimony from Dr. Pittman or Dr. Clayton should have been heard by the jury. Their testimony, like Detective Yeric's, should not serve as a mere conduit for otherwise inadmissible evidence. *See, e.g.*, TEX. R. EVID. 703 (allowing expert witness to base opinion on facts and data not otherwise admissible if such information is reasonably relied on by experts in that field in forming opinions or inferences); TEX. R. EVID. 705 (inadmissible facts or information relied on by expert excluded unless value of that evidence to explain or support expert's opinion outweighs danger the evidence would be used for other purposes); *Martinez v. State*, 22 S.W.3d 504, 508 (Tex. Crim. App. 2000) ("Since the trial court implicitly found [a witness] qualified as an expert, the State had no burden to invoke an exception to the hearsay rule."). *But see* TEX. CODE CRIM. PROC. ANN. art. 46B.007 ("A statement made by a defendant during a[ ] [competency] examination [or] the testimony of an expert based on that statement . . . may not be admitted in evidence against the defendant in any criminal proceeding, other than at: (1) a trial on the defendant's incompetency; or (2) any proceeding at which the defendant first introduces into evidence a statement [or] testimony . . . described by this article."). We leave it to the trial court's discretion on remand to determine, consistent with this opinion, the extent to which Dr. Pittman or Dr. Clayton can offer admissible evidence beyond their diagnosis that appellant suffered from PTSD.

we evaluate harm in the erroneous admission or exclusion of evidence for non-constitutional error under rule 44.2(b) of the Texas Rules of Appellate Procedure. *Ray v. State*, 178 S.W.3d 833, 836 (Tex. Crim. App. 2005); *see also* TEX. R. APP. P. 44.2(b).[8] For non-constitutional error in criminal cases, the error must be disregarded unless it affected the defendant's substantial rights. *See* TEX. R. APP. P. 44.2(b). A substantial right is not affected "when, after examining the record as a whole, the reviewing court has a fair assurance that the error did not influence the jury or had but a slight effect." *McDonald v. State*, 179 S.W.3d 571, 578 (Tex. Crim. App. 2005).

> In assessing the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case.

*Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). "The reviewing court may also consider the jury instructions, the State's theory and any defensive theories, closing arguments and even voir dire, if applicable." *Id*. at 355–56. Additionally, reviewing courts may examine whether the State emphasized the errors. *Id*. at 356.

The disputed testimony went to the heart of appellant's case, and its categorical exclusion had the practical effect of eviscerating his defense. While we acknowledge there is other evidence in this record from which the jury could have concluded appellant's defense of duress was not credible, we simply cannot say with any degree of assurance, given the record in this case, that the proffered testimony would have had no effect, or only a slight effect, on the jury's consideration of appellant's duress defense. *See* TEX. R. APP. P. 44.2(b). As the Austin Court of Appeals held under similar circumstances:

> We agree with the State that there is other evidence tending to rebut appellant's

---

[8] Neither party addressed the issue of what sort of harm analysis we should follow—i.e., whether we should apply rule 44.2(a), the test for constitutional errors, or rule 44.2(b), which applies to all other errors. But we agree with the Austin Court of Appeals, which addressed this issue on remand from the court of criminal appeals after that court remanded the case for a rule 44.2 harm analysis in *Miller v. State*, 36 S.W.3d at 509, that the proper standard in this instance is rule 44.2(b). *See Miller v. State*, 42 S.W.3d 343, 345 (Tex. App.—Austin 2001, no pet.).

claim of duress. But while we do not necessarily believe the jury would have acquitted appellant but for the court's error, we cannot state with fair assurance that the excluded testimony would have had no effect, or but slight effect, on the jury's consideration of appellant's affirmative defense. *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998) (conviction should not be overturned for nonconstitutional error if appellate court, after examining whole record, has fair assurance that error did not influence jury, or had but slight effect). We intimate no opinion as to the credibility of appellant's duress defense. We decide only that, on this record, appellant was harmed when the jury was not given the opportunity to hear testimony relevant to appellant's defense and assess its credibility along with the other evidence in the case

*Miller*, 42 S.W.3d at 347 (on remand from court of criminal appeals, holding that the defendant was harmed when the jury was not given an opportunity to hear testimony relevant to the defendant's duress defense that she was assaulted shortly after she sold cocaine).

We reach the same conclusion in this case. We express no opinion on whether appellant's defense of duress is ultimately credible in light of the proffered testimony. We hold only that, based on the record before us, the trial court erred in categorically excluding this evidence during the guilt–innocence phase of the trial and that appellant was harmed. We therefore sustain appellant's sixth, seventh, and eighth issues.

### IV. Motion to Suppress

Because the issue is likely to arise again on remand and has been briefed by the parties, we also address appellant's ninth issue, in which he argues the trial court erred in denying appellant's pretrial motion to suppress the July 6, 2016 interview with the police.

We review a trial court's denial of a motion to suppress for an abuse of discretion, applying a bifurcated standard of review. *Alford v. State*, 358 S.W.3d 647, 652 (Tex. Crim. App. 2012). We defer to the trial court's determination of historical facts that are based on assessments of credibility and demeanor. *Id*. We review de novo questions that do not turn on credibility and demeanor, including whether the historical facts constitute custodial interrogation. *Id.*

Statements made by a defendant during a custodial interrogation are inadmissible if, before

–33–

making the statements, the defendant did not receive warnings set out in *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), and the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a)(2); *Herrera v. State*, 241 S.W.3d 520, 525–26 (Tex. Crim. App. 2007). The defendant bears the initial burden to prove a statement was the product of a custodial interrogation. *Herrera*, 241 S.W.3d at 526.

The meaning of "custody" is the same for purposes of *Miranda* and article 38.22. *Id.* Generally, four situations may constitute custody: (1) the defendant is physically deprived of his freedom of action in any significant way; (2) a law enforcement officer tells the defendant he is not free to leave; (3) law enforcement officers create a situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted; or (4) there is probable cause to arrest the defendant, and law enforcement officers do not tell him he may leave. *Gardner v. State*, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009); *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). Under the first three situations, the restriction on the defendant's freedom of movement must reach "the degree associated with an arrest" instead of an investigative detention. *Dowthitt*, 931 S.W.2d at 255. Under the fourth situation, an officer's knowledge of probable cause must be manifested to the defendant and the record also must demonstrate "'other circumstances' of the interview, such as duration or factors of 'the exercise of police control over [the defendant],' would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Saenz v. State*, 411 S.W.3d 488, 496 (Tex. Crim. App. 2013) (quoting *Dowthitt*, 931 S.W.2d at 255).

An officer's knowledge of probable cause must be manifested to the suspect, and that manifestation could occur "if information substantiating probable cause is related by the officers to the suspect or by the suspect to the officers." *Dowthitt*, 931 S.W.2d at 255; *Garcia v. State*, 237 S.W.3d 833, 837 (Tex. App.—Amarillo 2007, no pet). "However, the manifestation of probable

cause does not automatically establish custody." *Garcia*, 237 S.W.3d at 837; *see also Saenz*, 411 S.W.3d at 496. "'Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue.'" *Saenz*, 411 S.W.3d at 497 (quoting *Stansbury v. California*, 511 U.S. 318, 325 (1994)). "[T]he question turns on whether, under the facts and circumstances of the case, 'a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave.'" *Ervin v. State*, 333 S.W.3d 187, 205 (Tex. App. —Houston [1st Dist.] 2010, pet. ref'd) (quoting *Nguyen v. State*, 292 S.W.3d 671, 678 (Tex. Crim. App. 2009)). The reasonable person standard presupposes an innocent person. *Dowthitt*, 931 S.W.2d at 254. The subjective intent of law enforcement officials to arrest is irrelevant unless that intent is somehow communicated or otherwise manifested to the suspect. *Ervin*, 333 S.W.3d at 205; *Dowthitt*, 931 S.W.2d at 254.

On February 19, 2018, the trial court conducted a motion to suppress hearing to determine the admissibility of appellant's statements, and only Detective Cayce Shelton testified. Detective Shelton testified that Detective Trujillano initially interviewed appellant on July 1, 2016. As the investigation continued and he gathered more information, Detective Shelton interviewed appellant again on July 6, 2016. Shelton and Detective Trujillano went to appellant's house for the second interview, which was conducted by Shelton. During the approximately twenty-eight minute interview, appellant appeared cooperative and willing to talk, and he willingly answered the detective's questions. Detective Shelton did not arrest appellant at the conclusion of the interview; he gave appellant his business card, told appellant he might call him the next day to update him on the investigation, and left. Shelton acknowledged that, at the time of the second interview, he had viewed Armijo's cell phone videos, including the video showing appellant in the background with the bleach and towels. He also had Villanueva's statement about appellant's bringing her to the offense location. When defense counsel asked, "You knew you were going to

arrest [appellant] for something?" Shelton replied, "I believed he took part in some aspect of the crime." And when defense counsel asked Shelton if he knew whether he was going to arrest appellant for some offense at the time of the July 6th interview, Shelton answered, "Yes, I did." Shelton also testified, however, that he "was investigating the totality of the incident," that he "can't say I knew I was going to arrest [appellant] for anything," and that he "had not decided at that time to charge [appellant] with any criminal offense."

Appellant argues that, combined with incriminating statements he made during the interview, Shelton's "foreknowledge" that he planned to arrest appellant elevated any investigative detention into an arrest, thereby requiring the administration of appellant's rights under *Miranda* and article 38.22. But giving due deference to the court's resolution of issues regarding credibility and demeanor, it was free to accept Shelton's testimony that he had not decided to charge appellant with any criminal offense. And even if we accept appellant's interpretation of the record, Shelton never manifested probable cause to arrest appellant during the July 6th interview. He emphasized that Armijo was in jail; that appellant was in the video Armijo had recorded on his cell phone; that the detective was trying to determine how honest appellant could be; and that it would do appellant no good to lie. Additionally, appellant was interviewed in his own home; he was not handcuffed at any time; the length of the interview was not unreasonable; the overall tone of the interview was conversational and non-confrontational; and there is no indication appellant's freedom of movement was restricted in any way or that he was not free to terminate the interview at any time.

Under these circumstances, we conclude a reasonable person would not have believed he was under restraint to the degree associated with an arrest. *See Saenz*, 411 S.W.3d at 496. Based on the record before us, the trial court did not abuse its discretion in denying appellant's pretrial motion to suppress.

Our disposition of appellant's sixth, seventh, and eighth issues renders it unnecessary for

us to address the other issues raised by appellant or the State's cross-point seeking modification of the judgment. We reverse the judgment of conviction and remand this cause for further proceedings.

/Lana Myers/

LANA MYERS
JUSTICE

Publish
Tex. R. App. P. 47.2(b)
180271F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

RICKY MORENO, Appellant

No. 05-18-00271-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 283rd Judicial District Court, Dallas County, Texas
Trial Court Cause No. F17-00878-T.
Opinion delivered by Justice Myers. Chief Justice Burns and Justice Molberg participating.

Based on the Court's opinion of this date, the judgment of the trial court is **REVERSED**

and the cause **REMANDED** for further proceedings consistent with this opinion.

Judgment entered this 29th day of August, 2019.